**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE-OPELOUSAS DIVISION**

|  |  |
|---|---|
| ROMAC ENVIRONMENTAL SERVICES, LLC | CIVIL ACTION NO. 6:20-cv-00581 (LEAD) NO. 6:20-cv-00588 (MEMBER) NO. 6:20-cv-01672 (MEMBER) |
| VERSUS | JUDGE ROBERT R. SUMMERHAYS |
| WILDCAT FLUIDS, LLC | MAGISTRATE JUDGE CAROL B. WHITEHURST |

**DEFENDANT ROMAC ENVIRONMENTAL SERVICES, LLC'S**
**OPPOSITION TO WILDCAT FLUIDS, LLC'S MEMORANDUM**
**AND SUPPLEMENTAL MEMORANDUM IN SUPPORT**
**OF PRELIMINARY INJUNCTION**

TO HONORABLE JUDGE ROBERT R. SUMMERHAYS:

COMES NOW Defendant ROMAC ENVIRONMENTAL SERVICES, LLC, ("Romac"), and files its' Opposition to Wildcat Fluids, LLC's Memorandum[1] and Supplemental Memorandum[2] in Support of Preliminary Injunction, and in support would show the Court as follows:

**I.**
**INTRODUCTION & BACKGROUND**

1.      This matter arises out of equipment and intellectual property rights related to the Sandcat flowback system.  In late 2017, DEL Corporation ("DEL") introduced representatives from Romac and Wildcat Fluids, LLC ("Wildcat") with the idea that the two entities may be able to enter into some sort of business arrangement.  After initial discussions, Romac performed due diligence and ultimately decided against a partnership of any kind with Wildcat.  Around the same

---

[1] Doc. 34.
[2] Doc. 84.

time, Wildcat was attempting to reach an agreement for the exclusive license of DEL's Sandcat equipment.  However, that deal fell apart as well.  Subsequently, Romac and DEL entered into an exclusive license agreement for the Sandcat on July 25, 2018.[3]  Romac had no knowledge of the prior discussions between DEL and Wildcat with respect to licensing of the Sandcat equipment and/or related intellectual property.

2.      Romac proceeded to purchase several Sandcats from DEL, which were placed in its rental equipment inventory.  Several months later, Romac and Wildcat entered into a Master Lease Agreement on August 6, 2018 (the "MLA").[4]  Pursuant to the terms of the MLA, Wildcat agreed to pay for rental equipment and services provided by Romac in accordance with stipulated rates.  Not long after entering into the MLA through December 18, 2019, Wildcat requested, and Romac provided, equipment and/or services as evidenced in the relevant invoices (the "Invoices").[5]

3.      Romac submitted Invoices to Wildcat with each invoice being due 30 days from the date of the invoice.[6]  As of May 2020, Plaintiff's lease payments were in arrears to the tone of $299,621.60.[7]  Romac made a formal demand for payment to Wildcat on February 7, 2020 through certified mail.[8]  Wildcat ultimately made two separate payments of $2,500, but have yet to pay the amount due in full.  Wildcat currently owes Romac $294,621.60.[9]

4.      Instead, Wildcat instituted an action in the United States District Court, Southern District of Texas, Corpus Christi Division on April 13, 2020.[10]  Wildcat's live pleading, its First

---

[3] *See generally* **Exhibit "A"** – Romac/DEL – Exclusive License and Supply Agreement.
[4] *See generally* **Exhibit "B"** – Romac/Wildcat Master Lease Agreement.
[5] *See generally* **Exhibit "C"** – Romac/Wildcat Rental Invoices (July – December 2019).
[6] *See generally id.*
[7] *See* **Exhibit "D"** – Romac/Wildcat Demand Letter.
[8] *See id.* (The letter was received by Wildcat on February 10, 2020).
[9] $299,621.60 – $5,000.00 = $294,621.60.
[10] *See* Doc. 1 (Cause No. 2:20-cv-00089 (USDC, Southern Dist. of Texas, Corpus Christi Division).

Amended Complaint (the "Complaint") was filed on July 17, 2020.[11]  Wildcat's retaliatory suit against Romac alleges a multitude of baseless claims ranging from fraudulent inducement to trade secret misappropriation.   On September 25, 2020, Wildcat filed its Motion for Preliminary Injunction.[12]   Following lawsuits filed by Romac[13] and DEL[14], Wildcat's Texas suit[15] was transferred to the instant Court and consolidated under the present cause number.[16]

     5.    Based on the authorities cited  herein, coupled with discovery completed to date and the argument of counsel, Romac seeks denial of Wildcat's application based on: (1) Wildcat's failure to satisfy the required elements for injunctive relief; (2) Wildcat's unreasonable delay in seeking injunctive relief; (3) Wildcat unlikeliness to succeed on the merits in this case; (4) DEL's position as lawful owner and senior user of the Sandcat; and (5) the lack of credible evidence that Romac intentionally infringed on any intellectual property of Wildcat.

## II.
### OPPOSITION TO WILDCAT'S PRELIMINARY INJUNCTION

**A.**    *Plaintiff Has Failed to Satisfy Threshold Requirements for Obtaining Preliminary Relief.*

     6.    A preliminary injunction is an extraordinary and drastic remedy, not to be granted routinely, and is to be treated as the exception rather than the rule.[17]  It is well-settled that a preliminary injunction will only be granted if the movant clearly carries its burden of persuasion on all four factors.[18]  "The four prerequisites are as follows: (1) a substantial likelihood that

---

[11] *See* Doc. 14 (Cause No. 2:20-cv-00089 (USDC, Southern Dist. of Texas, Corpus Christi Division).
[12] Docs. 34, 84.
[13] *See generally* Cause No. 6:20-cv-00588 (USDC, Western Dist. of Louisiana, Lafayette Division).
[14] *See generally* Cause No. 6:20-cv-00581 (USDC, Western Dist. of Louisiana, Lafayette Division).
[15] *See generally* Cause No. 2:20-cv-00089 (USDC, Southern Dist. of Texas, Corpus Christi Division).
[16] Doc. 27.
[17] *Mississippi Power & Light Co. v. United Gas Pipeline*, 760 F.2d 618, 621 (5th Cir.1985); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).
[18] *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008); *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989).

plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest."[19] A party seeking such relief must satisfy a cumulative burden of proving the essential elements enumerated before a preliminary injunction can be granted.[20] Otherwise stated, if a party fails to meet any of the requirements, the court cannot grant the preliminary injunction.[21]

7.      Wildcat's failure to carry its burden of proof on any one of these factors eliminates any basis for preliminary injunctive relief.[22]  Here, the Motion for Preliminary Injunction and Supplemental Memorandum in Support do not satisfy one or more of the threshold requirements for seeking such extraordinary relief.  As such, the Court should deny all relief sought within Wildcat's preliminary injunction.

### i.      Plaintiff Has Failed to Demonstrate an Irreparable Injury.

8.      Wildcat has failed to demonstrate that it will suffer an irreparable harm if the injunction is not granted.  Irreparable harm is neither speculative nor remote, and must also be actual and *imminent*.[23]  Further, a party has no need for preliminary relief so long as the alleged injury can be adequately redressed on final judgment.[24]  Only those injuries that cannot be

---

[19] *Canal Authority of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).

[20] *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *Nichols*, 532 F.3d at 372; *Gonannies, Inc. v. Goaupair.com, Inc.*, 464 F. Supp. 2d 603, 607 (N.D. Tex. 2006) citing *Canal Authority v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974) (en banc); *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987) (citing *Mississippi Power & Light Co.*, 760 F.2d at 621).

[21] *De Boulle Diamond & Jewelry, Inc. v. Boulle, Ltd.*, 3:12-CV-1462-L, 2015 WL 5033893 at 10 (N.D. Tex. Aug. 25, 2015).

[22] *See Cherokee Pump & Equip., Inc. v. Aurora Pump*, 38 F.3d 246, 249 (5th Cir. 1994); *Roho, Inc. v. Marquis,* 902 F.2d 356, 358 (5th Cir. 1990).

[23] *See Chason v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975); see also *Seven–Up Co. v. Coca–Cola Co.,* 86 F.3d 1379, 1390 (5th Cir. 1996), *aff'd*, 775 F.3d 230 (5th Cir. 2014).

[24] *Canal Authority*, 489 F.2d at 573.

redressed by the application of a judicial remedy after a hearing on the merits can properly justify a preliminary injunction.[25]  The *mere possibility* that other corrective relief will be available at a later date weighs heavily against a claim of irreparable harm.[26]

9.       Here, Wildcat does not present a viable theory of imminent injury for purposes of obtaining preliminary injunctive relief as it has failed to demonstrate an *imminent* harm.  From August 2018 through December 2019, Wildcat was able to generate revenue by means of renting Sandcats from Romac in accordance with a contract it knowingly and willingly entered into.[27]  The MLA specifically referenced who owned the equipment and what precisely what the equipment was.[28]  Wildcat has no argument whatsoever that the current situation presents one in which injury is imminent and irreparable, as it continued to lease Sandcats from both Romac and DEL for extended periods of time prior to the onset of this litigation pursuant to the Master Lease Agreements entered with Romac and DEL, respectively.[29]

10.      Wildcat has further failed to produce any financial statements and/or sales documentation substantiating a claim of imminent harm.  According to Wildcat, the alleged bad acts of Romac (and DEL) are claimed to have originated in mid-to-late 2017, yet this litigation did not arise until April 2020.[30]  Likewise, during 2017 and 2018, Wildcat entered into lease agreements with both Romac and DEL pertaining to the Sandcat.[31]  This equates to the alleged bad

---

[25] *Id.* at 573.
[26] *Chisom v. Roemer,* 853 F.2d 1186, 1189 (5th Cir. 1988).
[27] *See generally* **Exhibit "B"**; **Exhibit "C"**.
[28] *See* **Exhibit "B"**, at ¶ 19; p. 5 (Exhibit A).
[29] *See generally* **Exhibit "B"**; **Exhibit "C"**.
[30] While Romac vehemently denies that Wildcat has any claim to the SandCat trademarks, Wildcat alleges that the common-law trademark rights at issue "became effective on or before April 2018."
[31] *See generally* **Exhibit "B"**; **Exhibit "E"** (DEL-Wildcat Master Lease Agreement).

acts in question (*i.e.*, use of Sandcat marks) were ongoing for nearly three years without objection by Plaintiff.[32]

11.     The mere fact that over 18 months passed from the date Wildcat first entered into an MLA with Romac until the filing of the present action sufficiently demonstrates that corrective relief could be awarded at a later date, without further harm to the Wildcat.[33]   This delay dramatically undermines Wildcat's claims that it is at risk of irreparable harm absent injunctive relief.  Periods of time as short as 6 months have been held as too long a delay to reasonably seek injunctive relief.[34]   "Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief."[35]   To date, Wildcat has provided no explanation as to why it waited almost three years to seek injunctive relief in the instant case.

12.     Based on the foregoing, Wildcat cannot demonstrate that an injury is imminent. Because Wildcat has failed to meet the requirement of demonstrating a substantial threat of imminent and irreparable harm, the Court should not grant the preliminary injunction.

---

[32] Wildcat and DEL entered into MLA on September 19, 2017 (**Exhibit "E"**); Wildcat and Romac entered into MLA on August 6, 2018 (**Exhibit "B"**); Wildcat's Original Complaint in Case 2:20-cv-00089 filed on April 13, 2020.

[33] Over 2 years passed from the date Wildcat first entered into an MLA with DEL until the filing of the present action. As such, Wildcat has severely delayed seeking injunctive relief, which weighs against a finding of irreparable injury. *See Cablevision Sys. v. Verizon N.Y. Inc.*, 119 F.Supp3d 39, 51–52 (E.D.N.Y. 2015); *e.g.*, *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248–49 (11th Cir. 2016) (preliminary injunction was denied after plaintiff delayed five months in seeking injunction and did not offer explanation for delay).

[34] *ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 698 (N.D. Tex. 2015) (quoting *Gonannies, Inc.*, 464 F.Supp.2d at 609 (finding no irreparable injury where plaintiff waited six months between discovering the facts giving rise to an infringement claim and seeking an injunction)).

[35] *Id.*

ii.     **The Alleged Injury to Wildcat Does Not Outweigh Potential Damage to Romac.**

13.     In addition to being unable to prove irreparable harm, which alone precludes a preliminary injunction, Wildcat's application should also fail because the threatened injury to Wildcat does not outweigh any threatened harm to Romac.[36]

14.     Although Wildcat claims to be "a small oil and gas business, and derives all or substantially all revenues from its activities in the completions and drill-out sector"—there has been no financial documentation produced substantiating this claim.[37]   Wildcat also asserts to be a "small" business, but its website admits to building its own equipment.[38]   According to its website, Wildcat has been in the petroleum industry since 2011 and has catered to "all oil and gas basins in the United States."[39]   In addition to the Sandcat, Wildcat's website also includes services pertaining to mixing plants, the use of biodegradable chemicals and the reduction of greenhouse gas emissions.[40]   Wildcat's contract with Romac is just one of its potential revenue streams. Taking the above into account, any fears of Wildcat that allowing Romac to continue engaging in the legitimate use of the Sandcat marks will result in the loss of future income is pure speculation.

15.     Should the Court decide to grant Wildcat's preliminary injunction, Romac will be left without the use of 35 machines integral to its operations as it continues to move past the crippling pandemic and a fluctuating oil industry.   Romac, similar to any other business, has employees who count on their paychecks to cover the expenses of everyday life.   These individuals are reliant on their employer to continue engaging in profit-making business ventures.   Therefore,

---

[36] *See Valley v. Rapides Par. Sch. Bd.,* 118 F.3d 1047, 1051 (5th Cir. 1997).
[37] Doc. 35, ¶ 43.
[38] *See* **Exhibit "F"** – https://www.wildcatfluids.com/services ("Our equipment is designed, built and patented by Wildcat Fluids!").
[39] *See* **Exhibit "G"** –https://www.wildcatfluids.com/copy-of-about-1.
[40] *See generally* **Exhibit "H"** –https://www.wildcatfluids.com/.

if Wildcat's application be approved at this premature stage of the litigation, there is no question that it will economically harm Romac's employees and business as a whole.[41]

### iii.    The Balance of Equities Does Not Favor Plaintiff.

16.    The court must "balance the harm that will occur to the moving party from the denial of the preliminary injunction with the harm that the non-moving party will incur if the injunction is granted.[42]  Courts generally "disfavor a preliminary injunction that affords the movant substantially all the relief he may recover at the conclusion of a full trial on the merits.[43]

17.    Romac would be highly prejudiced by an injunction issued by this Court where the allegations in Wildcat's Motion for Preliminary Injunction and the allegations raised in the Complaint are nearly indistinguishable in nature.[44]  The only difference in relief sought seems to be Wildcat's request for additional monetary damages.  Thus, without the benefit of full discovery and the Court's consideration of the claims presented in their entirety, the granting of the subject injunction would highly prejudice Romac in its defense of the claims presented in the Complaint.  Therefore, the factors of justice and undue prejudice weigh heavily against entering a preliminary injunction against Romac at this time.

18.    As previously stated, where a party fails to meet one or more of the four requirements, the Court cannot grant the preliminary injunction.[45]  In this case, the Motion for

---

[41] *See Admor Hvac Prods. v. Lessary,* No. 19-00068 SOM-KJM, 2019 WL 2518105, at *15 (D. Haw. 2019); *Filter Specialists Inc. v. Hendi,* No. 3:08 CV 365, 2008 WL 11391139, at *11 (N.D. Ind. 2008); *Prosperity Sys., Inc. v. Ali,* No. CIV. CCB-10-2024, 2010 WL 5174939, at *5–6 (D. Md. 2010).

[42] *Winter*, 555 U.S. at 24; *Conceal City, L.L.C. v. Looper L. Enf't, LLC,* 3:10-CV-2506-D, 2011 WL 5557421 at 8 (N.D. Tex. Nov. 15, 2011).

[43] *Primedia Intertec Corp. v. Technology Marketing Corp.,* 35 F.Supp.2d 809 (D. Kan. 1998).

[44] *Compare* Doc. 34 and Doc. 84 *with* Doc. 14 (Cause No. 2:20-cv-00089 (USDC, Southern Dist. of Texas, Corpus Christi Division).  The allegations contained in Wildcat's Motion for Preliminary Injunction (and Supplemental Memorandum in Support) are identical to the relief sought in its First Amended Complaint.

[45] *De Boulle,* 3:12-CV-1462-L, 2015 WL 5033893 at *10.

---

Preliminary Injunction does not satisfy any of the aforementioned threshold requirements for seeking such extraordinary relief and should be denied.

**B.      *Plaintiff is Unlikely to Prevail on the Merits.***

19.      To obtain a preliminary injunction, Plaintiff must also establish there is a substantial likelihood it will prevail on the merits. To prevail on a trademark infringement claim, a plaintiff must show (1) that the mark, as the case may be, qualifies for protection and (2) that defendant's use of the mark creates a likelihood of confusion in the minds of potential consumers.[46]  Because the plaintiff needs to satisfy both elements to prevail on the merits, it is not entitled to the injunctive relief requested if it fails to establish either element.[47]

**i.      No Likelihood of Confusion.**

20.      When analyzing a trademark infringement action, it is important to analyze whether a mark is likely to cause confusion with another.[48]  The term "likelihood of confusion" means *more than a mere possibility;* rather, Plaintiff must demonstrate a probability of confusion.[49]  The Fifth Circuit sets out a non-exhaustive list of factors to be considered when determining a likelihood of confusion.[50]  These factors include (1) the type of trademark; (2) mark similarity; (3) product similarity; (4) outlet and purchaser identity; (5) advertising media identity; (6) defendant's intent; (7) actual confusion; and (8) care exercised by potential purchasers.[51]  No one factor is dispositive.[52]

---

[46] *Pebble Beach Co. v. Tour 18 Ltd.,* 155 F.3d 526, 536 (5th Cir. 1998).
[47] *BuzzBallz, LLC. v. JEM Bev. Co., LLC,* 3:15-CV-588-L, 2015 WL 3948757 at 2 (N.D. Tex. June 26, 2015).
[48] *Xtreme Lashes, LLC v. Extended Beauty, Inc.,* 576 F.3d 221, 226 (5th Cir. 2009) (citing *Marathon Mfg. Co. v. Enerlite Prods. Corp.,* 767 F.2d 214, 217 (5th Cir. 1985)).
[49] *Id.*
[50] *Xtreme Lashes*, 576 F.3d at 227.
[51] *Id.*
[52] *Id.*

21.     In analyzing the issue of "confusion", the court must consider the purchaser identity of the products in question and the sophistication of the relevant consuming public.[53]   It is undisputed that consumers in this day and age have developed a sophistication when it comes to the use of heavy machinery and reputable vendors.   Additionally, with the advent of the internet, consumers are in a better position to research and vet potential sellers.

22.     In this case, the source of any confusion is wholly due to the conduct of Wildcat. Specifically, it appears that Wildcat has begun to manufacture and use its own version of the "Sandcat."[54]   Accordingly, Wildcat is creating the confusion by manufacturing and marketing a different machine than the ones it has been leasing from Romac and DEL (which are manufactured and patented by DEL) since 2018.[55]   Wildcat has taken such measures when it is fully aware through its contractual dealings with Romac (and DEL) that DEL maintained a patent on the machine and processes.[56]

23.     The Sandcats rented from Romac and DEL have specific manufacturer and serial numbers so that the use of these products can be traced in the field.[57]   Wildcat cites an anonymous e-mail in which a customer claims that the Sandcat "caught a black eye from a previous job."[58] However, "evidence of actual confusion must show 'more than a fleeting mix-up of names'; rather it must show that 'the confusion was caused by the trademarks employed and it swayed consumer purchases.'"[59]   Wildcat has provided no further information about the equipment discussed in the e-mail.   Wildcat does not give any clarification about the actual job, the specific machine used

---

[53] *Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d 188, 194 (5th Cir. 1998).
[54] *See generally* **Exhibits "F", "G", "H"**.
[55] *See id.*; *see also* **Exhibits "B", "E"**,
[56] *See generally* **Exhibits "B", "E"**.
[57] *See* **Exhibit "B"**, at p. 5 (Exhibit A).
[58] Doc. 34, ¶ 32.
[59] *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 450 (5th Cir. 2017) (quoting *Xtreme Lashes*, 576 F.3d at 229).

(manufacturer and serial numbers), where the customer got the equipment for the job, or whether the machine was one that was leased from Romac and/or DEL.[60]  This lack of proof of actual confusion weighs heavily against Wildcat, as does the price of renting a Sandcat and the likely high degree of care exercised by purchasers of this equipment.[61]

24.     Romac denies that Wildcat has ownership rights of any kind related to any mark related to the Sandcat, but in the interest of transparency, will dive into the intent element.  When it comes to an examination of intent, there can be no question that the actions of Romac and its use of the Sandcat are justified and done in good faith. The Fifth Circuit has held that its "intent inquiry focuses on whether the defendant intended to derive benefits from the reputation of the plaintiff."[62]  In this case, Romac's intent weighs heavily against granting an injunction.   While Wildcat repeatedly asserts Romac and DEL infringed on their mark, the overwhelming evidence— including all contracts, relevant correspondence and intellectual property documentation— suggests that Wildcat was kept abreast of all business happenings among the three parties.  This is further evidenced by the fact that Wildcat freely entered into contracts and rented Sandcats from both Romac and DEL for an extended period of time prior to making any ownership claim.  Therefore, based on the record available, the Court lacks evidence to find that Romac intentionally copied or infringed on any mark belonging to Wildcat.

25.     Weighing the eight digits of confusion together, the evidence available at this time is not sufficient to demonstrate a likelihood of confusion between the various Sandcats employed in the marketplace.[63]  Without showing a likelihood of confusion, in addition to being unable to

---

[60] *Id.*

[61] *See* **Exhibit "I"** (John McElligott III Depo.), at p. 12, l. 3–6; **Exhibit "J"** (Keith Wingate Depo.), at p. 74, l. 7–10;

[62] *Streamline*, 851 F.3d at 455 (quoting *Bd. of Supervisors for La. State Univ. Agric. & Mech. College v. Smack Apparel*, 550 F.3d 465, 481 (2008).

[63] Wildcat has provided no evidence that it has actually put a "Sandcat" of its own (*i.e.*, one that it manufactured) into the marketplace, other than claims made during this litigation and marketing on its website.  *See* **Exhibit "K"** –

demonstrate an irreparable injury, Wildcat cannot establish likelihood of success on the merits in order to justify the "extraordinary remedy" of a preliminary injunction.[64]  Having illustrated that Wildcat clearly cannot carry its burden for at least two of the four requirements, the Court should deny the motion for a preliminary injunction.

### ii.    The Mere "Idea" of the Sandcat Does Not Equate to a Trademark.

26.    Wildcat is further unable to prevail on the trademark claims asserted as the Sandcat mark does not qualify for protection.  Trademarks indicate the sources of goods and services. Protection against consumer confusion is the core of modern trademark law: trademark ensures that people can get what they want when they buy a good or service.[65]  As the leading treatise, by Professor J. Thomas McCarthy, states, "U.S. trademark law is based primarily on a policy of protecting customers from confusion: trademark law is seen as a form of consumer protection."[66] Unlike patent law, rights in trademarks are not gained through discovery or invention of the mark, but only through actual usage.[67]  Trademark priority is not simply granted to the person who was first to conceive of the idea of using a given symbol as a mark.[68]

27.    In this case, Wildcat cannot show claim protection or ownership of the mark simply by claiming that, as it alleges, it personally designed the Sandcat name and/or logo prior to doing

---

Wildcat's Answers/Responses to DEL's First Discovery Requests (RFP 20 – When asked to produce "All documents, things, and ESI concerning Your selling, renting, leasing, or using SandCat units not manufactured by DEL.", Wildcat's response was "None."); **Exhibit "L"** – Wildcat's Answers/Responses to Romac's First Discovery Requests (ROG 25 – "When, if ever, did Wildcat Fluids, LLC begin building and/or manufacturing SandCat units?", Wildcat's answer "Wildcat has never built or manufactured SandCat units."); **Exhibits "F" – "H"** (Wildcat website).

[64] *PCI Transp., Inc. v. Fort Worth & W. R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005) (quoting *Mississippi Power & Light Co.*, 760 F.2d at 621 ("[A] preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements.").

[65] *See, e.g.*, *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 157 (1989) ("[Trademark's function is] protecting consumers from confusion as to source. While that concern may result in the creation of 'quasi-property rights' in communicative symbols, the focus is on the protection of consumers . . . .").

[66] J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 19:1.75 (4th ed. 2013).

[67] *Blue Bell, Inc. v. Farah Mfg. Co., Inc.*, 508 F.2d 1260, 1264–65 (5th Cir. 1975); *Malibu, Inc. v. Reasonover*, 246 F.Supp. 2d 1008, 1014–15 (N.D. Ind. 2003)

[68] J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 16:11 (4th ed. 2013).

business with Romac and DEL.  Ownership of the mark is established not by proof regarding who actually conceived of the logo or concept at issue, but rather by use of the marks in the marketplace.[69]  No trademark rights accrue to someone who merely selects a designation without the actual use of it in the advertising or sale of goods. Trademark rights grow out of use not mere adoption.[70]

28.     In the instant case, DEL created the initial prototype of Sandcat system by making modifications to its Total Clean filtering system.[71]  DEL alone conceived of, designed and built the first Sandcat system at its facilities in Scott, Louisiana in late 2017.  The ownership and protection of the Sandcat system was solidified by DEL through the filing of an application for patent on December 21, 2017.[72]  Accordingly, the record and available evidence establish that DEL has ownership of the Sandcat based on its manufacture and actual usage in the marketplace.

### iii.     The Sandcat Design was Conceived by DEL Corporation.[73]

28.     In August 2017, representatives of DEL and Wildcat met to discuss DEL's potential construction of a custom trailer for transporting Wildcat's mixing plant units.  During this meeting, DEL's representatives noticed a centrifuge on Wildcat's property.  This sparked a discussion regarding the conventional process being utilized within the oilfield industry for separating solids and liquids during oilfield flowback operations.  Robert Kulbeth proposed that DEL's patented

---

[69] *See id.*; *see also Blue Bell*, 508 F.2d at 1264–65; *Malibu, Inc.*, 246 F.Supp. 2d at 1014–15.

[70] *See Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 413–14 (1916); *see also Trade-Mark Cases*, 100 U.S. 82, 94 (1879) ("At common law the exclusive right to it grows out of its use, and not its mere adoption.").

[71] *See* **Exhibit "M"** (Robert Kulbeth Depo.), at p. 16, l. 5–24; p. 24, l. 22 –  p. 26, l. 5; p. 28, l. 13–14; p. 47, l.14 – p.51, l. 7; p. 65, l. 21 – p. 66, l. 21; p. 72, l. 17 – p. 73, l. 4; p. 88, l. 18 – p. 89, l. 13; p. 134, l. 21 – p. 135, l. 3; p. 150, l. 21 – p. 151, l. 3; p. 151, l. 7 – p. 152, l. 15; p. 153, l. 13 – p. 155, l. 20; *see generally* **Exhibit "N"** (Sworn Affidavit of Robert Kulbeth).

[72] *See* **Exhibit "M"**, at  p. 88, l. 18 – p. 89, l. 13; p. 134, l. 21 – p. 135, l. 3; p. 150, l. 21 – p. 151, l. 3; p. 151, l. 7 – p. 152, l. 15.

[73] The language used within § ii is primarily derived from the Sworn Affidavit of Robert Kulbeth, Doc. 7.1 (Cause No. 2:20-cv-00089 (USDC, Southern Dist. of Texas, Corpus Christi Division).  For the convenience of the Court and to avoid superfluous references, a copy of the Affidavit is attached and shall be marked as **Exhibit "N"**.

Total Clean could be modified to provide a more effective, efficient system.  Wildcat expressed an interest in marketing the proposed unit to the oil and gas industry.

29.     Following the August 2017 meeting, DEL created the initial prototype of its flowback system by making several novel modifications to its Total Clean filtering system.  The Sandcat unit's patent-pending design was conceived solely by Robert Kulbeth—President of DEL Corporation—and exclusively developed by DEL personnel.  In fact, Wildcat's Complaint tacitly admits that DEL was the exclusive owner of the Sandcat technology.[74]  Unambiguously, the Complaint acknowledges that the proposed framework for the business arrangement between the companies was an exclusive license from DEL to Wildcat.[75]  If Wildcat believed it had any ownership interest in the technology, it obviously would not have been in the position of requiring such a license.  It is only after the demands for payment on the rental invoices and breakdown in licensing negotiations that Wildcat belatedly asserted ownership rights.

30.     Although Wildcat asserts that Romac and DEL have unjustly "reap[ed] the benefit of Wildcat's trade secrets, confidential information, and know-how", there have been no specifics pertaining to what this entails.  Equally, Wildcat's claim that it was forced to "to compete for jobs against its own Sandcat technology" is without merit because it in fact has no ownership interest in the Sandcat.  Because the overwhelming evidence suggests that DEL conceived of, and put into action, the Sandcat design, Wildcat's application for preliminary injunction should be denied.

### iv.     DEL Corporation is the Senior User of the Sandcat.

31.     A party seeking an injunction for trademark infringement must clear several hurdles in order to prevail.[76]  It must prove that it is the "senior user" of the mark.[77]  The first one to use a

---

[74] *See generally* Doc. 14 (Cause No. 2:20-cv-00089 (USDC, Southern Dist. of Texas, Corpus Christi Division).
[75] *Id.* at ¶ 35.
[76] *Union Nat'l Bank v. Union Nat'l Bank*, 909 F.2d 839, 844–45 (5th Cir. 1990)
[77] *Id.*

mark in the marketplace is generally held to be the "senior user".[78]  The senior user "is entitled to enjoin other 'junior' users from using the mark, or one that is deceptively similar to it."[79]

32.    Any claim made by Wildcat that it is the senior user of the Sandcat, based on the April 2018 XTO job is simply inaccurate.[80]  This claim is based on the fact that it was Wildcat's customer and Wildcat claims to have placed "Sandcat" sticker on the machine.[81]  However, Wildcat fails to mention that the machine was manufactured by DEL, paid for (*i.e.*, "owned") by Romac and that personnel for both DEL and Romac personnel were on the job as well for because Wildcat's people did not know how to troubleshoot the equipment.[82]  As such, it was DEL who initially placed the Sandcat into the marketplace, through its manufacture and sell of the equipment and intellectual property to customers, such as Romac, and others.[83]

33.    Additionally, through the conduct of Wildcat, namely entering into contractual agreements with both Romac and DEL pertaining to the lease of Sandcats, Wildcat has admitted to not being the senior user of the Sandcat.  By Wildcat's own allegations, DEL maintains ownership of the Sandcat by virtue of their priority of use in the market.  Neither Wildcat's delayed registration of the mark, nor claims that DEL and Romac infringed on the mark, establish ownership of the Sandcat on behalf of Wildcat.

**v.**    **Romac's Use of the Sandcat is Lawfully Derived from Licensing Agreement with DEL Corporation**

34.    Wildcat claims that Romac has "infringed and is actively infringing upon Wildcat's trademarks by using the Sandcat trademarks in commerce in connection with the lease, rent, and

---

[78] 15 U.S.C. §§ 1051–1127 (1988).
[79] *Union Nat'l Bank*, 909 F.2d at 844–45.
[80] *See generally* Docs. 34, 84.
[81] *Id.*
[82] *See* **Exhibit "J"**, at p. 29, l. 21 – p. 30, l. 1; p. 46, l. 5 – p. 47, l. 3; p. 47, l. 9 – p. 50, l. 4; **Exhibit "M"**, at p. 59, l. 10 – p. 60, l. 4.
[83] *See generally* **Exhibits "A"**, **"B"**, **"E"**; *see also* **Exhibit "T"**, at p. 6, l. 1 – 5; **Exhibit "M"**, at  p. 34, l. 4–5.

operation of the Sandcat units."[84]  This is simply untrue.  It wasn't until after Romac confronted

Wildcat for the continued refusal to pay outstanding rental invoices that Wildcat filed suit and

made such fallacious accusations.[85]  Prior to the onset of this litigation, Romac was unaware of the

business dealings between DEL and Wildcat.[86]  It was also unclear to Romac if DEL had initially

offered Wildcat any sort of licensing agreement pertaining to the Sandcat.[87]

35.      A cursory review of the exclusive licensing agreement entered into between DEL

and Romac illustrates that the contract included language that the lease, use, and/or sale of the

Sandcat would not violate any third party intellectual property rights.[88]  This warranty was based

on representations from DEL was it was the owner of all the intellectual property rights at issue.[89]

In pertinent part, the exclusive licensing agreement provides as follows:

ARTICLE 5
WARRANTS AGAINST THIRD-PARTY INFRINGEMENT

DEL warrants that, to the best of its knowledge and belief, the use,
sale, offering for sale, manufacture or marketing of the Sandcats in
accordance with this Agreement ***will not infringe any existing patent(s) or
other intellectual property rights of third parties***.[90]

36.      The exclusive licensing agreement also outlined what conduct is unpermitted by

Romac in regards to the intellectual property at issue.[91]  Paragraph 2.3, entitled "Intellectual

Property" states:

(a)      Except for the rights expressly granted under this Agreement,
nothing in this Agreement will function to transfer ***any of DEL's
intellectual property rights associated with the Sandcat*** to Romac, and
***DEL retains ownership of all such rights***.  Romac shall promptly and full

---

[84] Doc. 34, ¶¶ 27–35.
[85] *See* **Exhibit "D"**.
[86] **Exhibit "I"**, at p. 7, l. 16 – p. 8, l. 5; **Exhibit "J"**, at p. 7, l. 15 – p. 8 , l. 15; p. 10, l. 5 – p. 12, l. 7;  p. 13, l. 14 – p. 15, l. 8; p.18, l. 16 – p. 20, l. 12.
[87] *Id.*
[88] *See generally* **Exhibit "A"**.
[89] *Id.*
[90] *Id.* at p. 5, Article 5 (emphasis added).
[91] *Id.* at p. 2–3, ¶ 2.3 (a)–(b).

disclose to DEL any and all inventions, discoveries, improvements, ideas or other works of inventorship or authorship, whether or not patentable, that are conceived and/or reduced to practice by Romac, its employees, consultants, agents, and/or representatives and that embody or require use or incorporation of the Sandcat ("Developments"), Romac agrees to assign and hereby does assign to DEL or its designee all of Romac's rights, title and interest, including copyrights and patent rights, in and to all Developments, and Romac shall also ensure that its employees, consultants, agents, and representatives are contractually required to assign to DEL all rights, title, and interest, including copyrights and patent rights, in and to all Developments.

(b) Romac also agrees that Romac, its affiliates, including but not limited to Macro Companies, Inc. of Delaware, and its and their employees or representatives will not file any patent application that discloses or claims a method, process, system, or apparatus for the treatment or recycling of drilling or other fluids and which expressly describes or references the Sandcat without first obtaining the express written consent of DEL.  Should there be a violation of this Section 2.3(b), DEL will have the option to immediately terminate this Agreement, in addition to any other remedies made available pursuant to this Agreement or by law.[92]

37.    Again, it is important to note that Wildcat was provided the same exact draft licensing agreement by DEL as Romac, including the Article 5 warranty referenced above and language pertaining to the Sandcat's provisional patent application.[93]  Should Wildcat have truly thought it had any ownership interest in the Sandcat, one look at this language should have caused them to immediately seek legal relief—or at a minimum, document the improper accusations. Wildcat did not take any action that could possibly be interpreted as an attempt to protect intellectual property it had a realistic ownership right to.[94]  Consequently, after seeing the language referenced above, there is no question that Wildcat knew (1) DEL was claiming the intellectual

---

[92] *Id.* (emphasis added).
[93] *See* **Exhibit "M"**, at p. 13, l. 6 – 12; p. 153, l. 13 – p. 155, l. 20; p. 155, l. 21 – p. 157, l. 11; p. 162, l. 17 – p. 163, l. 24; *see also* **Exhibit "O"** – DEL-Romac Proposed Licensing Agreement.
[94] *See generally* **Exhibit "O"**; *see also* **Exhibits "A"**, **"B"**, **"E"**.

property rights associated to the Sandcat and (2) DEL was providing a warranty that the use of the Sandcats would not infringe on any other entities' ownership rights.[95]

38.  Wildcat's ownership claim to the Sandcat is further diminished based on language found within the MLA it entered into with Romac.[96]   After Romac executed the licensing agreement with DEL, it began to purchase units from DEL and lease them out.[97]   Wildcat voluntarily signed the MLA with Romac signifying its acquiescence to Romac's use and ownership of the Sandcats leased.[98]   Pertinent language in the MLA with respect to ownership of the equipment being rented by Wildcat from Romac provided:

> OWNERSHIP OF EQUIPMENT; ENCUMBRANCES: **The Equipment is, and shall at all times remain, the property of the Lessor, and the Lessee shall have no right, title or interest therein, or thereto except the right of possession and use of the Equipment pursuant to the terms of this agreement**.  Lessee shall not remove or deface any plate or marking on the Equipment identifying Lessor as the owner of the Equipment or the manufacturer's serial number.  The Equipment is, and shall at all times remain, personal property notwithstanding that the Equipment or any part thereof may now be, or hereafter become, in any manner affixed or attached to any other personal or real property.  The Lessee shall keep the Equipment free and clear of any and all levies, liens, security interest and encumbrances of any kind, and shall give the Lessor prompt notice of any attachment or judicial process affecting the Equipment.[99]

39.  Romac maintained clean hands during its entire business dealings with both DEL and Wildcat.  Romac entered into lawful contracts with both parties and operated in accordance with those agreements.[100]   At no time did Romac use fraudulent or deceitful tactics, nor did they make misrepresentations to Wildcat.  Romac has also not made any attempts to trademark Sandcat

---

[95] *See generally* **Exhibit "A"**.
[96] *See generally* **Exhibit "B"**.
[97] **Exhibit "I"**, at p. 6, l. 1 – 5; p. 5, l. 18 – p. 6, l. 10; *see also* **Exhibits "B", "C"**.
[98] It is also worth noting that Exhibit A of the MLA entered into between Romac and Wildcat (p. 5) lists "Sandcat #1" as the applicable equipment; it further provides that DEL Tank is the manufacturer of the device.
[99] *See* **Exhibit "B"**, ¶ 19 (emphasis added).
[100] *See generally* **Exhibit "A"**; **Exhibit "B"**.

or claim absolute ownership of any of the associated intellectual property or equipment. Ultimately, Romac's conduct illustrates that its use of the intellectual property rights at issue were done in a lawful and appropriate matter.

### III.
### CONCLUSION

40.    Wildcat's attempt at injunctive relief is improper and not in accordance with applicable case law and statutory support.  This is further evidenced by the lawful use of the Sandcat trademark by Romac (and DEL) and Wildcat's unreasonable delay in seeking injunctive relief.  Even apart from this, any potential injury to Wildcat is purely speculative, as no financial documents have produced and no supporting testimony has been provided by Wildcat representatives.  As such, Romac requests Wildcat's application for a preliminary injunction and all applicable relief be denied.

41.    This brief is not intended to be an exhaustive recitation of all Romac's arguments in response to Wildcat's application for a preliminary injunction but only an overview highlighting certain legal and factual issues.  Romac further refers the Court to the argument of counsel and adopts the opposition filed by DEL to the extent it does not conflict with Romac's position herein.

### IV.
### PRAYER

**WHEREFORE,** Defendant ROMAC ENVIRONMENTAL SERVICES, L.L.C. prays that Wildcat Fluids, LLC's Memorandum  and Supplemental Memorandum  in Support of Preliminary Injunction Plaintiff's Motion for Preliminary Injunction[101], and all relief set forth therein be denied in its entirety and for such other and further relief, both general and special, at law or in equity, to which Defendant may be entitled.

---

[101] Docs. 34, 84.

Respectfully submitted,

NEUNERPATE


BY:      */s/ Frank X. Neuner, Jr.*
         FRANK X. NEUNER, Jr. (#7674), TA
         fneuner@neunerpate.com
         JENNIFER M. ARDOIN (#30378)
         jardoin@neunerpate.com
         One Petroleum Center
         1001 W. Pinhook Road, Suite 200
         Lafayette, Louisiana 70503
         Telephone: (337) 237-7000
         Facsimile:  (337) 233-9450

         and

WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP

         */s/* **Kent M. Adams**
         KENT M. ADAMS (LA #02324)
         Texas Bar No. 00869200
         Kent.Adams@wilsonelser.com
         STEPHEN A. HEBERT
         Pro Hace Vice
         Texas Bar No. 24079672
         Stephen.Hebert@wilsonelser.com
         909 Fannin Street, Suite 3300
         Houston, Texas 77010
         Telephone:  (713) 353-2000
         Facsimile:   (713) 785-7780

         ***Attorneys for Romac Environmental Services, LLC.***

## CERTIFICATE OF SERVICE

I hereby certify that on 6th of September, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ *Stephen A. Hebert*
Stephen A. Hebert