EXHIBIT "J"

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| ROMAC ENVIRONMENTAL SERVICES, LLC | NO.: 6:20-cv-00581-RRS-CBW (LEAD) CONSOLIDATED WITH NO.: 6:20-cv-01672 (MEMBER) NO.: 6:20-cv-00588 (MEMBER) |
| VERSUS | JUDGE ROBERT R. SUMMERHAYS |
| WILDCAT FLUIDS, LLC, | MAGISTRATE JUDGE CAROL B. WHITEHURST |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

The deposition of Keith Wingate taken in

the above-entitled cause, before Connie S. Ezell,

Certified Court Reporter, at the office of Jones

Walker LLP, 600 Jefferson Street, Suite 1600,

Lafayette, Louisiana, on August 5, 2021, commencing

at 9:01 a.m.

CONNIE S. EZELL
CERTIFIED SHORTHAND REPORTER
404 HARBOR BEND BOULEVARD
LAFAYETTE, LOUISIANA  70508
(337) 344-2935

1

1                          **APPEARANCES**

2      REPRESENTING ROMAC ENVIRONMENTAL SERVICES, LLC:

3      MR. FRANCIS X. NEUNER, JR., ATTORNEY AT LAW
       NEUNER PATE
4      1001 West Pinhook Road, Suite 200
       Lafayette, LA  70508
5      fneuner@neunerpate.com

6      MR. STEPHEN A. HEBERT, ATTORNEY AT LAW (By Phone)
       WILSON ELSER MOSKOWITZ EDELMAN & DICKER
7      909 Fannin Street, Suite 3300
       Houston, TX  77010
8      stephen.hebert@wilsonelser.com

9      REPRESENTING WILDCAT FLUIDS, LLC:

10     MR. DOUGLAS W. TRUXILLO, ATTORNEY AT LAW
       ONEBANE LAW FIRM
11     1200 Camellia Boulevard, Suite 300
       Lafayette, LA  70508
12     truxillod@onebane.com

13     MR. TERRY B. JOSEPH, ATTORNEY AT LAW
       MR. D. RYAN CORDELL, JR., ATTORNEY AT LAW
14     MATTHEWS, LAWSON, McCUTCHEON & JOSEPH
       2000 Bering Drive, Suite 700
15     Houston, TX  77057
       tjoseph@matthewsfirm.com
16     dcordell@matthewsfirm.com

17     REPRESENTING DEL CORPORATION:

18     MR. ROBERT L. WADDELL, ATTORNEY AT LAW
       JONES WALKER LLP
19     600 Jefferson Street, Suite 1600
       Lafayette, LA  70501
20     rwaddell@joneswalker.com,

21     MR. CADE A. EVANS, ATTORNEY AT LAW (By Phone)
       ALLEN & GOOCH
22     2000 Kaliste Saloom Road, Suite 400
       Lafayette, LA  70508
23     cadeevans@allengooch.com

24     ALSO PRESENT:  MR. ALAN BROWN

25

                                                              2

1                          EXAMINATIONS
                                              PAGE
2
       BY MR. JOSEPH                    5
3      BY MR. WADDELL                   75

4

5                            EXHIBITS

6      EXHIBIT NO. 1 -                  22
       E-mails
7      EXHIBIT NO. 2 -                  28
       E-mails And Attachment
8      EXHIBIT NO. 3 -                  31
       E-mails And Attachment
9      EXHIBIT NO. 4 -                  33
       E-mails
10     EXHIBIT NO. 5 -                  41
       E-mails And Attachment
11     EXHIBIT NO. 6 -                  44
       Romac Letter - 3/12/18
12     EXHIBIT NO. 7 -                  52
       E-mails And Attachment
13     EXHIBIT NO. 8 -                  55
       E-mails
14     EXHIBIT NO. 9 -                  62
       E-mails
15     EXHIBIT NO. 10 -                 65
       E-mails And Attachment
16     EXHIBIT NO. 11 -                 70
       E-mails

17

18

19

20

21

22

23

24

25

                                                        3

1          <u>S T I P U L A T I O N</u>

2

3               It is stipulated and agreed by and between

4          counsel for the parties hereto that the deposition

5          of the aforementioned witness is hereby being taken

6          for all purposes allowed under Federal Rules of

7          Civil Procedure, in accordance with law, pursuant to

8          notice;

9               That the formalities of reading and signing

10         are specifically waived;

11              That the formalities of filing, sealing and

12         certification are specifically waived;

13              That all objections, save those as to the

14         form of the question and the responsiveness of the

15         answer, are hereby reserved until such time as this

16         deposition, or any part thereof, may be used or

17         sought to be used in evidence.

18                              * * *

19

20

21

22              CONNIE S. EZELL, Certified Shorthand

23         Reporter in and for the State of Louisiana,

24         officiated in administering the oath to the witness.

25

                                                            4

```
 1                         answer --
 2                              THE WITNESS:  Okay.
 3                              MR. NEUNER:  -- or Connie has
 4                     a mean right hook.  She's gonna --
 5                              THE WITNESS:  No, I know her.
 6                     She's not --
 7                              MR. NEUNER:  Just slow down
 8                     and --
 9                              THE WITNESS:  Okay.
10                              MR. NEUNER:  Going fast won't
11                     make it go faster.
12                              THE WITNESS:  Okay.
13                              MR. NEUNER:  Okay.
14    BY MR. JOSEPH:
15    Q.   What business did Romac do with DEL before Wildcat
16         came into the picture?
17    A.   We started doing with DEL probably about a year
18         before.  We went to DEL to go ahead and manufacture
19         two pieces of equipment for us.  One was called the
20         Kodiak and one was called the Beast.  And basically
21         what it was for was cleaning drill waste.  The Kodiak
22         was to go ahead and reclaim drill mud to give back to
23         the rig and drive the solids to reduce their trucking
24         cost, and the Beast was where we remediate everything
25         on site.
```

7

1   Q.   Okay.

2   A.   That's how we got started.  Basically what we took is

3        Bob's Total Clean system that he had been using for

4        the dredging, the drying of spoils, and we took that

5        and modified it for the oilfield is what we did.

6   Q.   Okay.  And when you say we modified it, who modified

7        it?  Who was involved in the modifications?

8   A.   Well, it was predominantly us and DEL.  We had some

9        ideas what we wanted, but Bob Kulbeth is the one who

10       came up with the design of everything.  He took his

11       basic premise of what he had, and he took that -- and

12       what we said, we -- we need to have this done and this

13       done.  This is the end results we need to have.  And

14       so Bob took it upon himself to do those -- make it

15       work.

16  Q.   Okay.  If you could, tell me what those two thises

17       were.

18  A.   Excuse me.  Say that again.

19  Q.   Sure.  If you could, tell me -- you said we need to

20       have this done and this done.  What were these two --

21  A.   Well, like on the Beast, I had to have certain

22       retention time for the chemical to work, okay, so as

23       we receive the drill cuttings, the waste -- drill

24       waste, as we received it, I'd have the retention time

25       so the chemical I was using could break it all down,

                                                              8

1    Q.   Yes, sir.

2    A.   Okay.  No.

3    Q.   Did it separate oil from the water and the sand?

4    A.   Yes, it did.

5    Q.   Okay.  So how did Wildcat and Romac and DEL become

6         involved with what became the SandCat?

7    A.   I went to Bob in October of 2017, I think it is -- I

8         think it's 2017 -- September -- latter part of

9         September/October time frame, and I said, Bob, I said,

10        look, I said, I want to get into the -- the solids

11        business on the flow back, picking up their solids

12        with his trucking -- I'm sorry, drying their solids, I

13        apologize, drying their solids.  And I said, couldn't

14        we use the same premise that we have now in the Beast

15        and the Kodiak to do that.  Well, at the same time

16        Mike Kulbeth was on location with -- with Wildcat.

17        Okay?  My understanding, it took some of Bob's shakers

18        and a few other things tied to a open top tank.

19        The -- they started processing through that to

20        demonstrate how dry we could get the -- the solids on

21        the back side of it to reduce their trucking cost.

22        Okay?  So Bob told me about that.  Mike came back.  He

23        says, you need to call this guy right here and see

24        possibly what y'all can do to work together, and so I

25        went ahead and called Jeff Weber.

10

1    Q.   So Mike Kulbeth was on location --

2    A.   Uh-huh.

3    Q.   -- with --

4              Is that a yes?

5    A.   Yes.

6    Q.   -- was on location with Jeff Weber and Wildcat --

7    A.   Correct.

8    Q.   -- performing services with a device that ultimately

9         became the SandCat?

10   A.   I don't know if it ultimately became the SandCat,

11        because that piece of equipment -- all it was was open

12        top tank and two shakers and a gas buster on top of

13        it.

14   Q.   Okay.

15   A.   The SandCat's totally different from that, I mean,

16        so -- it's more intricate than that is.  Okay?

17                      MR. NEUNER:  It's more --

18              it's more what?

19                      MR. JOSEPH:  Intricate?

20                      THE WITNESS:  Yeah,

21              intricate -- yeah.

22                      MR. NEUNER:  Okay.

23                      THE WITNESS:  Thank you,

24              yeah.

25   BY MR. JOSEPH:

                                                        11

1    Q.   Well, how did Mike Kulbeth and Wildcat get together,

2         if you know?

3    A.   I have no idea.

4    Q.   Okay.  How long had Mike Kulbeth and DEL been working

5         with Wildcat before you said I need a device that --

6    A.   I have -- I have no idea.  I don't -- I don't know.

7         I'm sorry.

8    Q.   I normally go through a bunch of housecleaning

9         measures very -- at the very beginning.

10   A.   Okay.

11   Q.   Have you ever given a depo before?

12   A.   No.

13   Q.   Okay.  If we talk at the same time -- you can see our

14        court reporter's writing everything down.

15   A.   Right.

16   Q.   If we talk at the same time --

17   A.   I apologize.

18   Q.   -- like that --

19                        MR. NEUNER:  See, you just

20                   did it --

21                        THE WITNESS:  Yeah, I know.

22   BY MR. JOSEPH:

23   Q.   -- then it makes it hard, and uh-huhs and huh-uhs and

24        um-hums don't come out too well either --

25   A.   Okay.

                                                              12

1    Q.   -- so you have to say yes or no.

2    A.   All right.

3    Q.   And I'm terrible about interrupting too, but I will

4         try to let you finish your answer if you let me finish

5         my question.  Okay?

6    A.   Okay.

7    Q.   All right.

8                          MR. NEUNER:  And I'll try and

9              be the referee.

10                         THE WITNESS:  Okay.

11                         MR. NEUNER:  Just take your

12             time.  We have all day.

13   BY MR. JOSEPH:

14   Q.   What -- if you know, what was DEL and Romac working

15        on?

16   A.   I don't understand the question.

17   Q.   I'm sorry.  It was a bad question.  What was DEL and

18        Wildcat working on that Mike Kulbeth was out there at

19        the site?

20   A.   I don't know.  I don't know.  All I know is is that

21        when I went talk to Bob about it, he told me they were

22        on the site with Jeff Weber -- he didn't even say --

23        he didn't mention Jeff's name at the time, he just

24        said with a -- with a customer, you know, running a

25        test using his shakers to prove see -- to prove how

                                                        13

```
 1            dry we could get the cuttings --

 2    Q.    Okay --

 3    A.    -- the solids.

 4    Q.    -- but the device that was being tested also had a gas

 5          buster, right?

 6    A.    Yes.  I think it was -- I think the gas buster

 7          belonged to Jeff Weber.  It was his gas buster.

 8    Q.    And this is what -- is -- is this device that Mike was

 9          out watching operate what you went to Bob and said,

10          hey, I need a device that does this or is it a

11          different device?

12    A.    Repeat your question one more time please.

13    Q.    Sure.  You went to Bob Kulbeth and said I need

14          something --

15    A.    Uh-huh.

16    Q.    -- that can do X, Y and Z?

17    A.    Yes.

18    Q.    Let's see if we can modify the Kodiak and the Beast to

19          perform X, Y and Z.  Is that fair?

20    A.    That's fair.

21    Q.    Okay.  Was the device that Wildcat was operating and

22          Mike Kulbeth was watching a device that performed the

23          X, Y and Z that you wanted to have?

24    A.    Yes and no.

25    Q.    Okay.
```

14

1    A.   Yes to the point where they got the cuttings dry.

2         Okay?  No is where -- okay, there was no device on

3         there how to skim the oil at the time for the

4         application, and also too it had no really holding

5         capacity in the tank they used.  It needed more

6         holding capacity and process time, so that was part of

7         the changes that had to be made going forward off

8         that -- that test they did.

9    Q.   Okay.  Do you know if that job that Mike Kulbeth was

10        on was a job for Carrizo Oil & Gas?

11   A.   I think so.  I'm not sure.  I think it was Carrizo Oil

12        & Gas.  I'm not really sure.

13   Q.   And did the device that Wildcat was operating out

14        there separate water, solids, oil and gas?

15   A.   I'm not sure.  All I know is that what I was aware of

16        was is the solids side of it.  My main concern was to

17        reduce trucking cost, what we did with the Kodiak and

18        the Beast.  That was my main concern, because trucking

19        cost was a huge cost for operators out there with

20        limited amount of trucks available to them, so that

21        was my main -- main focus.

22   Q.   Okay.  So you weren't really interested that much in

23        fracking water, correct?

24   A.   No.

25   Q.   Okay.  At some point, you -- when I say you, I'm

                                                              15

1   Q.   Okay.  Did you make any technical contributions to

2        what became the SandCat?

3   A.   No.

4   Q.   Did Alan Brown make any technical contributions to

5        what became the SandCat?

6   A.   I have no idea.

7   Q.   How about -- did Jeff Weber make any technical

8        contributions to what became the SandCat?

9   A.   I assume so.

10  Q.   Okay.  Are you on any patents with DEL?

11  A.   No.

12  Q.   Going -- okay.  Do you have any patents?

13  A.   No.

14  Q.   Does Romac have any patents?

15  A.   Not that I'm aware of.

16  Q.   If you could, explain to me what your understanding is

17       of the concept that DEL and Romac and Wildcat were

18       going to try to effectuate and put in place.  It's my

19       understanding that DEL was going to manufacture, Romac

20       was going to finance and Wildcat was going to market.

21       Is that anywhere close?

22  A.   No --

23  Q.   Okay.

24  A.   -- no, it's not.

25  Q.   Please tell me.

18

```
 1   A.   My main thought at the time and also talking to Bob
 2        and Alan and Jeff was at that time Jeff was pretty
 3        well financially hamstrung, you know.  He didn't have
 4        much capital at the time.  Okay?  We needed an in to
 5        other customers, so my basic thought was we would go
 6        ahead and build this piece of equipment, lease it to
 7        Wildcat at a favorable price or do a lease/purchase or
 8        even -- or a sale price to them, okay, to where they
 9        could get the unit out to his customer base so we
10        could use it as a test to prove to other customers --
11        their -- other competition in that field, okay --
12   Q.   Let me hop in.  You're saying Romac was going to
13        finance the manufacture of this device that Wildcat
14        was going to use --
15   A.   Uh-huh.
16   Q.   -- because you wanted an in road to the customer?
17                        MR. NEUNER:  Objection to the
18                   form of the question.
19                        MR. JOSEPH:  I'm not trying
20                   to mischaracterize it.  I'm just trying
21                   to understand.  That's okay.
22                        MR. NEUNER:  Yeah, the
23                   word -- if you want to know what -- the
24                   word that bothers me is finance.  They
25                   were going to pay for it.
```

                                                       19

```
 1                              THE WITNESS:  Pay for it.

 2                              MR. NEUNER:  They weren't

 3                     going to finance it, they were going to

 4                     pay for it.

 5      BY MR. JOSEPH:

 6      Q.   You were going to pay to have it manufactured?

 7      A.   Correct.

 8      Q.   Okay.  And then rent it to Wildcat?

 9      A.   Correct.

10      Q.   And they were going to go perform services for their

11           customers?

12      A.   Correct.

13      Q.   And that would get your foot in the door for the

14           customers?

15      A.   Right, correct -- not for much for the SandCat, for

16           the Beast --

17      Q.   Right.

18      A.   -- and the Kodiak, because they way I priced it to

19           those guys -- I told them, we'll also pay you a

20           percentage of the daily rates of the Kodiak and the

21           Beast when it's used on one of your customers' sites.

22           As long as it's out there, you will get financial

23           reward for that unit.  That was my end goal --

24      Q.   Okay.

25      A.   -- you know, a win win for everybody.  So they was
```

20

1        that this piece of equipment could be used for flow

2        back.

3  Q.  Do you know if Wildcat had ever been out to DEL's

4        facility to look at their equipment?

5  A.  I have no idea.

6  Q.  Do you know if DEL had ever been to Wildcat's facility

7        to look at their equipment?

8  A.  Other than when Mike was on location, I don't know.

9  Q.  And on location is that job in October of --

10  A.  October, November -- I think it was the November time

11        frame.

12  Q.  -- '17?

13  A.  Yeah, it was November, because I left the day after

14        Thanksgiving to go down there.

15  Q.  Okay.  Then on the first page at the bottom Jeff is

16        responding to you, and he has some modifications and

17        he mentions that was the problem last time.  What's he

18        talking about there, the problem last name?

19  A.  I don't know.  I don't know.

20  Q.  Did you just --

21  A.  And I could -- I could not answer Jeff's questions.

22        That's why I forwarded the e-mail over to Bob Kulbeth.

23  Q.  Okay.

24  A.  Since it was his design, his machine, I wasn't going

25        to answer for Bob on his piece of equipment, so that's

29

1           why I copied Bob on it, so he responded.

2      Q.   Okay.  Did you disagree with any of the modifications

3           Jeff is talking about?

4      A.   No, I just -- neither did I disagree with Bob's

5           recommendations.  Honestly, I didn't care.  All I

6           wanted the machine to do was work so I could sell

7           something and prove to customers that I could get

8           their solids dry enough that they didn't have to worry

9           about trucking, so I didn't care about the internal of

10          the machine, how it worked, what it did.  I really

11          didn't.

12     Q.   Did you ever offer any ideas on the technical details

13          of the working of the machine?

14     A.   No.  What I did was -- I wanted ease of

15          transportation.  This is why I got to have the

16          transport down the road since we are a trucking

17          company ourselves -- well, Macro is.  Our parent

18          company's a trucking company.  We're going to use

19          Macro's trucks, so I had to make sure that we could

20          haul this thing down the road at least the smallest

21          amount of cost as possible.  That was my main

22          concern -- and rig-up time.  I wanted to make sure on

23          rig-up time that it was quick and easy to rig up and

24          also to rig down.  That was my main concern.  But from

25          once -- once it started coming to the machine and

                                                              30

1   A.   Whenever I had a call for it, yes.  After a while,

2        everybody knew what SandCat was, but initially that's

3        what it was called.

4   Q.   Okay.

5   A.   This patent -- I think he got a patent on the flow

6        back -- Total Flow Back -- flow -- I'm not sure, but I

7        think he applied for a patent on it.

8   Q.   Okay.  Did you ever suggest to anyone at DEL that you

9        should be listed on a patent also?

10  A.   Yes.  Not for the SandCat, it was for the Beast unit

11       and -- because I had a proprietary chemical to use to

12       break down hydrocarbons, okay, and I was going to

13       apply for the patent for that -- that application

14       using the Beast unit -- DEL unit as the mechanism to

15       get it there from Point A to Point B.

16  Q.   Did you ever suggest to anybody at DEL that you should

17       be listed as an inventor on a patent on the SandCat?

18  A.   No.

19  Q.   Did you ever have any discussions with anyone at DEL

20       about Jeff Weber being listed as an inventor on the

21       SandCat?

22  A.   No.

23  Q.   In your letter of March 12th, 2018, why are you

24       referring to it as the Total Flow Back Clean rather

25       than the SandCat?

46

1    A.    Because that's the name Bob had in his drawings,
2          initial drawings, of the unit, and his patent was on
3          that piece of equipment.
4    Q.    Would Bob have known what you were talking about if
5          you had said the SandCat?
6    A.    I assume so.  I don't know.  I can't answer that
7          affirmatively, no.  I assume he would after the
8          conversations we had.
9    Q.    Okay.  Now, the -- is the first job that was performed
10         by a SandCat unit that DEL manufactured, Romac bought
11         and rented to Wildcat, was that XTO?
12   A.    Yes, but it -- there was no rent charged for that
13         unit.
14   Q.    They wanted to see if it would work or not?
15   A.    Correct.
16   Q.    And who was operating the machine in the field?
17   A.    Wildcat and DEL Tank both were on the job.
18   Q.    Okay.  Who was -- who from DEL was out there operating
19         the SandCat?
20   A.    Jeff was there and numerous other people from DEL -- I
21         mean, from Wildcat.  I don't know their names.  He had
22         four or five guys out there.
23                        MR. NEUNER:  I think his
24               question was who from DEL.
25                        THE WITNESS:  Oh, I'm sorry,

                                                              47

```
 1              signed.  I don't remember.
 2        Q.    Was there a license agreement between DEL and Wildcat
 3              at that time period?
 4        A.    I don't know.
 5        Q.    Was there ever a license agreement between DEL and
 6              Wildcat?
 7        A.    I don't know.
 8        Q.    Was there ever a license agreement between Romac and
 9              Wildcat?
10        A.    Yes.
11        Q.    And was that already executed by March of 2018?
12        A.    I don't remember.
13        Q.    Let me show you what I've marked as Exhibit 11, and
14              Exhibit 11 is an e-mail chain.  The first one is from
15              you to -- it's DEL_27657, and the first one's an
16              e-mail from you to Richard, which would be Richard
17              McElligott, right?
18        A.    Correct.
19        Q.    And it's talking about the XTO job, right?
20        A.    Uh-huh.  Correct.
21        Q.    And that's the first, quote unquote, job, right?
22        A.    Correct.
23        Q.    Who from Romac was out on the job that is referenced
24              in Exhibit 11?
25        A.    I just went out to view the machine running.
```

                                                              70

1    A.   I don't know.

2    Q.   How about completions?

3    A.   I don't know.

4    Q.   Okay.  What, to your knowledge, was Mike Kulbeth's

5         experience in completions?

6    A.   I don't know.

7    Q.   Okay.  Are you aware of any confusion among customers

8         about the SandCat, whether it's a DEL SandCat, the

9         Romac SandCat or the Wildcat SandCat?

10   A.   No, I'm not aware of any of that.

11   Q.   Okay.  So tell me how these stickers are stuck on

12        these machines.  Is it a peel and stick?

13   A.   It's a peeling sticker, yes.

14   Q.   How much -- how hard is it to get them off?

15   A.   I don't know.  I just know over time because of wear

16        they'll start peeling and cracking, but to get it off,

17        I don't know.  I don't know.

18   Q.   I mean, a wire brush and five minutes?

19   A.   I guess.  I don't know.  I've never attempted it, so I

20        don't really know.

21   Q.   In any event, it would not be some massive expense to

22        get these stickers off the machines, would it?

23   A.   I wouldn't think so.

24   Q.   Okay.

25                         MR. JOSEPH:  Pass the

                                                              74