UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| ROMAC ENVIRONMENTAL SERVICES LLC | CASE NO. 6:20-CV-00581 LEAD |
| VERSUS | JUDGE ROBERT R. SUMMERHAYS |
| WILDCAT FLUIDS LLC | MAGISTRATE JUDGE CAROL B. WHITEHURST |

## MEMORANDUM RULING

Presently before the Court is the Motion for Preliminary Injunction [ECF No. 35][1] filed by Wildcat Fluids, LLC. A hearing on the matter was held on September 27 and 28, 2021 and the motion was taken under advisement.

### I.
### BACKGROUND AND FINDINGS

The present case is a trademark dispute involving equipment designed and manufactured by defendant DEL Corporation ("DEL") and marketed under the trademark "Sandcat" to the oil and gas services industry. Plaintiff Wildcat Fluids, LLC ("Wildcat") contends that it is the senior user of the Sandcat mark. Specifically, it contends that it conceived and designed the original Sandcat logo and trademark, and first used the mark in commerce during a job it performed for one of its customers in April 2018. DEL contends that it owns the Sandcat mark, and that both

---

[1] The Motion for Preliminary Injunction was originally filed in the member case *Wildcat Fluids, LLC v. DEL Corporation and Romac Environmental Services, LLC* when the case was before the Southern District of Texas. The case was subsequently transferred to the Western District of Louisiana and became of a member case to the related above captioned matter.

1

DEL and its licensee, Romac Environmental Services., LLC ("Romac"), began actively using the Sandcat mark in commerce prior to Wildcat's claimed first use. Wildcat contends that DEL's and Romac's continued use of the Sandcat mark creates confusion within the market and violates the Lanham Act.[2] Accordingly, Wildcat seeks a preliminary injunction preventing DEL and Romac from continuing to use the Sandcat mark.

### A. The Parties.

Wildcat is a limited liability company organized under the laws of the state of Texas, with its principal place of business located in Mathis, Texas.[3] Wildcat was formed in 2012 by Jeff Weber and operates as an oilfield services and equipment rental business.[4] Romac is a limited liability company organized under the laws of the state of Louisiana.[5] Romac's principal place of business is in Broussard, Louisiana.[6] Romac specializes primarily in the rental of equipment for the well-site treatment and remediation of fluids and associated materials generated or in connection with oil and/or gas wells.[7] DEL is a business corporation organized under the laws of the state of Louisiana. DEL's principal place of business is in Scott, Louisiana. DEL specializes in the design, manufacturing, sales and rental of customized tank systems and equipment for all types of dredging, dewatering, solids control, solids separation and material handling projects.[8]

### B. Development of the Sandcat Device.

In the early 2000's, DEL developed and patented its Total Clean system to separate solids and liquids.[9] In August 2017, representatives of Wildcat and DEL began discussing the design and

---

[2] 15 U.S.C. § 1051 et seq.
[3] ECF No. 1 at ¶ 2.
[4] ECF No. 1 at ¶ 1 in Case No. 6:20-cv-1672
[5] *Id.* at ¶ 1.
[6] *Id.*
[7] Transcript of Preliminary Injunction Hearing Held September 27-28, 2021 ("Tr.") [ECF No. 127] at 130-31.
[8] *Id.*
[9] Tr. at 132.

2

manufacture by DEL of a trailer-mounted mixing plant to process flowback fluids from "fracking" operations.[10] DEL's President, Robert Kulbeth, testified that he and another DEL representative, Michael Kulbeth, noticed a centrifuge sitting on a rack on Wildcat's property and inquired about how that centrifuge was used in Wildcat's business operations.[11] The Wildcat representatives explained the conventional processes used by service providers to separate gases, liquids, and solids returning from the wellbore during flowback operations, and they explained that they used the centrifuge to remove additional solids to avoid clogging the sock filters that were utilized with the conventional process.[12] Kulbeth testified that, at the time, he recognized that DEL's patented Total Clean System could improve the conventional processes used by oilfield service providers for flowback operations.[13] Kulbeth testified that, with input from Wildcat on the needs of its customers, he designed modifications to DEL's original patented system to allow it to separate the three phases of matter (solids, liquids, and gases) returning to the surface during flowback operations.[14] The prototype of the equipment was first successfully tested in November 2017 by Wildcat on a job performed for its customer, Carrizo Oil and Gas.[15] At the time of the Carrizo job, the equipment was referred to by the parties as the "Total Clean System Flowback Separator."[16] In December 2017, DEL filed for patent protection for the equipment known as "Flowback Separation System and Method," and in February 2020, DEL was granted U.S. Patent No. 10,751,654 for the equipment.[17]

---

[10] Tr. at 145-47.
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] Tr. at 14, 17.
[16] Tr. at 16.
[17] Tr. at 48, 149-50; DEL Exh. 39.

### C. **Wildcat's Business Relationship with DEL and Romac.**

Wildcat's plan was that DEL would manufacture the modified Total Clean Flowback System and then either sell or lease the units to Wildcat; Wildcat would then use the equipment to provide services to its customers. Wildcat, however, did not have the financial ability to purchase the equipment.[18] DEL therefore introduced Wildcat to Romac.[19] From November 2017 through June 2018, Wildcat and Romac Environmental Services, LLC ("Romac") negotiated a potential business arrangement whereby: (i) Romac would invest directly into Wildcat so that Wildcat could buy the DEL-manufactured Sandcat Units; or (ii) Romac would purchase the DEL-manufactured Sandcat units itself and then lease or rent-to-own at least a portion of the Sandcat fleet to Wildcat to assist in the purchase of the equipment.[20] In the end, because of Wildcat's financial condition, the parties were only able to negotiate a master lease agreement.

In June of 2018, Wildcat attempted to negotiate an exclusive license with DEL for the Sandcat unit. On June 13, 2018, Bob Kulbeth, the owner and president of DEL, forwarded a proposed License and Supply Agreement[21] to Weber. This proposal included requirements that Wildcat purchase at least ten Sandcat units during the first two years of the agreement, and five units during the next three years. The proposed agreement also required financial guarantees from Wildcat.[22] DEL's proposed licensing agreement expressly referred to the equipment as the "Sandcat," and included provisions stating that DEL would own all intellectual property rights related to the Sandcat.[23] Wildcat did not have the funds or financial backing to enter into DEL's proposed licensing agreement.

---

[18] Tr. at 70, 85.
[19] Tr. at 157-58.
[20] *Id.*
[21] DEL Exhibit ("Exh.") 49.
[22] DEL Exh. 49.
[23] *Id.*

4

Because Wildcat could not enter into a licensing agreement for the Sandcat, on July 25, 2018, DEL entered into an exclusive License and Supply Agreement[24] with Romac granting it the exclusive right to buy, lease, and market the Sandcat. The License and Supply Agreement referred to the equipment as the Sandcat and provided that DEL would own all intellectual property rights related to the Sandcat.[25] The License and Supply Agreement included a provision stating that "DEL warrants that, to the best of its knowledge and belief, the use, sale, offering for sale, manufacture or marketing of the Sandcats in accordance with this Agreement will not infringe any existing patent(s) or other intellectual property rights of third parties."[26]

On August 6, 2018, Romac and Wildcat entered into a Master Lease Agreement.[27] Under the Master Lease Agreements with both DEL and Romac, Wildcat leased equipment, including the Sandcat, from both companies. Romac purchased approximately thirty-five (35) Sandcat units from DEL and leased that equipment to oilfield service companies, including Wildcat.[28] Wildcat ultimately leased three (3) of Romac's thirty-five Sandcat units.[29]

### D. **Conception of the Sandcat Mark**.

Wildcat's founder, Jeff Weber, testified that on a road trip in December 2017, he and Alan Brown conceived of the name "Sandcat" to describe DEL's modified Total Clean flowback system.[30] Webber testified that his wife, Melissa Weber, developed the first design for the Sandcat logo and that Wildcat paid to produce stickers with the Sandcat logo that it intended to affix to the modified Total Clean flowback units that it leased from DEL and Romac.[31]

---

[24] DEL Exh. 52.
[25] *Id.*
[26] *Id.*
[27] *See* Romac Exh. 12 and Wildcat Exh. 52; there is a dispute as to which agreement is the fully signed and executed agreement. However, for purposes of the present issue before the Court, the terms of the agreements are identical.
[28] Tr. at 71.
[29] *Id.* Wildcat leased 1 Sandcat unit directly from DEL. *Id.*
[30] Tr. at 18-19.
[31] Tr. at 41-43.

DEL and Romac characterize the adoption and use of the Sandcat mark in marketing DEL's modified flowback units as more of a joint effort. The evidence in the record does not contradict Weber's account of the origin of the Sandcat mark, nor do DEL's and Romac's witnesses contradict Weber's account. However, the record reflects that both DEL and Romac made plans to market DEL's modified flowback units using the Sandcat mark in the first six months of 2018. In March 2018, Romac developed a marketing brochure for its Sandcat units that included the title "Romac presents ... the Sandcat ...." (Figure 1).[32] A copy of the proposed brochure was sent to Wildcat on March 20, 2018, and Wildcat requested a version with Wildcat's name: "Wildcat presents .... The Sandcat ...."[33] DEL also engaged a graphics firm to produce different versions of the Sandcat logo.[34] The evidence in the record also reflects that, throughout 2018, Romac marketed its fleet of thirty-five DEL modified flowback units under the Sandcat trademark pursuant to its licensing agreement with DEL.[35] These units were not marketed exclusively to Wildcat or to Wildcat's customers.





FIGURE 1

---

[32] Romac Exh. 4.
[33] Romac Exh. 2; Tr. at 95-96.
[34] DEL Exh. 76; Tr. at 172-73.
[35] Tr. at 73-74.

### E. The April 2018 XTO Job.

The first commercial use of the DEL Sandcat device was in April 2018.[36] Wildcat leased a Sandcat unit that Romac had purchased from DEL.[37] Wildcat used this unit to provide flowback services to one of its customers, XTO Energy.[38] The Sandcat unit used at XTO's site bore the logos of both Wildcat and Romac.[39] Weber, however, testified that Wildcat affixed one of the Sandcat stickers it had produced to the unit used on the XTO job.[40] Wildcat contends that the use of this unit with the sticker affixed by Wildcat was the "first use" of the Sandcat mark in commerce, and that Wildcat became the "senior user" of the mark as a result of using the mark on the XTO job.

### F. Wildcat's Competing Device.

At some point in 2019, Wildcat conceived, designed, and built its own, competing version of DEL's Sandcat unit. Wildcat also marketed its device as the Sandcat.[41]

### G. The Present Litigation.

In 2020, Wildcat ceased making payments due under the Master Lease Agreements to both DEL and Romac. When Romac demanded payment, the present lawsuits ensued. Wildcat now seeks a preliminary injunction enjoining DEL and Romac from use of the Sandcat trademarks. Both DEL and Romac oppose the requested relief. A hearing on the matter was held on September 27, 2021 and continued the following day.

---

[36] Tr. at 37-38.
[37] *Id.*
[38] *Id.*
[39] Romac Exh. 16; Tr. at 96.
[40] Tr. at 38.
[41] Tr. 79-80.

## II.
### PRELIMINARY INJUNCTION STANDARD

A party seeking a preliminary injunction under Rule 65 must show: (i) a substantial likelihood of success on the merits; (ii) that the movant will suffer irreparable injury without the injunction; (iii) that the threatened injury to the movant outweighs the threatened harm to the party whom he seeks to enjoin; and (iv) that granting the injunction will not disserve the public interest.[42] The decision to grant an injunction is "an extraordinary remedy and should be granted only if the movant has clearly carried the burden of persuasion with respect to all four factors."[43]

To prove a likelihood of success on the merits, the moving party must show that it will "likely prove" the merits of its claims.[44] The standard for proving irreparable injury is not a mere possibility, but a likelihood:

> Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction. Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.[45]

The third prong of the test requires the Court to balance the harm that would be suffered by the movants if the injunction were denied against the possible harm that would result to the opposing party if the injunction were granted.[46] The fourth prong of the test requires the Court to determine whether granting the injunctive relief will disserve the public interest.[47]

---

[42] *Lakedreams v. Taylor*, 932 F.2d 1103, 1107 (5th Cir. 1991).
[43] *Allied Marketing Group, Inc. v. CDL Marketing, Inc.*, 878 F.2d 806, 809 (5th Cir. 1989).
[44] *Mylan Institutional LLC v. Aurobinado Pharma Ltd*, 857 F.3d 858, 866 (5th Cir. 2017).
[45] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (internal citations omitted).
[46] *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 626 (5th Cir. 1985).
[47] *Id.* at 625-26.

## III.
## LAW AND ANALYSIS

### A. <u>Likelihood of Success on the Merits</u>.

Wildcat must first establish that it is likely to succeed on the merits of its trademark infringement claim. To prevail on a trademark infringement claim, a plaintiff must show (1) that the mark qualifies for protection and (2) that defendant's use of the mark creates a likelihood of confusion in the minds of potential consumers.[48] A trademark is "a symbol (word, name, device or combination thereof) adopted and used by a merchant to identify his goods and distinguish them from articles produced by others."[49] A party seeking an injunction for trademark infringement must clear several hurdles.[50] First, it must prove that it is the "senior user" of the mark.[51] The first party to use a mark in commerce is "generally held to be the 'senior' user and is entitled to enjoin other 'junior' users from using the mark, or one that is deceptively similar to it."[52] Priority of use, not registration, gives an entity trademark rights.[53] Unlike the rights conferred by a patent, trademark rights are not created through discovery or invention of the mark, but only through actual usage of the mark in commerce.[54] Thus, ownership of a trademark is not based on evidence of which party first conceived the trademark; ownership is based on the actual use of the mark in the marketplace.[55]

---

[48] *Pebble Beach Co. v. Tour 18 I Ltd.,* 155 F.3d 526, 536 (5th Cir. 1998).
[49] *Blue Bell, Inc. v. Farah Mfg. Co.,* 508 F.2d 1260, 1264–65 (5th Cir. 1975).
[50] *Union Nat. Bank of Tex., Laredo, Tex. v. Union Nat. Bank of Tex., Austin, Tex.,* 909 F.2d 839, 844–45 (5th Cir. 1990).
[51] *Id.*
[52] *Union Nat. Bank Tex.,* 909 F.2d at 842.
[53] *See* J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 16:1.50 (5th ed. 2021) ("[I]t is not registration, but only actual [first] use of a designation as a mark that creates rights and priority over others."); *United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 100 (1918) ("The general rule is that, as between conflicting claimants to the right to use the same mark, priority of appropriation determines the question").
[54] *Blue Bell, Inc. v. Farah Mfg. Co., Inc.,* 508 F.2d 1260, 1264–65 (5th Cir. 1975); *Malibu, Inc. v. Reasonover,* 246 F.Supp. 2d 1008, 1014–15 (N.D. Ind. 2003).
[55] *Id.*; *Blue Bell,* 508 F.2d at 1264–65; *Malibu, Inc.,* 246 F.Supp. 2d at 1014–15.

9

The plaintiff in a trademark infringement action must also show a likelihood of confusion. "The trademark laws exist not to 'protect' trademarks but [instead] to protect the consuming public from confusion, concomitantly protecting the trademark owner's rights to a nonconfused public."[56] Modern trademark law thus ensures that consumers are actually receiving what they want when they buy a good or service.[57] The term "likelihood of confusion" means *more than a mere possibility*; rather, the movant must demonstrate a probability of confusion.[58] The Fifth Circuit has articulated a non-exhaustive list of factors to be considered when determining a likelihood of confusion.[59] These factors include (1) the type of trademark; (2) mark similarity; (3) product similarity; (4) outlet and purchaser identity; (5) advertising media identity; (6) defendant's intent; (7) actual confusion; and (8) care exercised by potential purchasers.[60] No one factor is dispositive.[61]

### 1. Was Wildcat the "Senior User" of the Sandcat Mark?

Here, the parties' arguments and evidence focus on ownership of the Sandcat mark and the likelihood of confusion. Wildcat points to evidence that it conceived the Sandcat mark in December 2017.[62] Wildcat also points to evidence that it designed the first Sandcat logo and paid for the creation of a Sandcat sticker that was placed on the Sandcat unit used for the April 2018 XTO project. Wildcat thus contends that it is the "senior user" of the Sandcat trademark because it first used the mark in commerce in April 2018.

---

[56] *Falcon Rice Mill, Inc. v. Community Rice Mill, Inc.*, 725 F.2d 336, 348 (5th Cir.1984).
[57] *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 157 (1989).
[58] *Xtreme Lashes, LLC v. Extended Beauty, Inc.*, 576 F.3d 221, 226 (5th Cir. 2009) (citing *Marathon Mfg. Co. v. Enerlite Prods. Corp.*, 767 F.2d 214, 217 (5th Cir. 1985)).
[59] *Xtreme Lashes*, 576 F.3d at 227.
[60] *Id.*
[61] *Id.*
[62] Tr. at 18-19.

The evidence in the record does not support Wildcat's position that it is the senior user of the Sandcat mark because the evidence does not show that Wildcat's use of the mark in April 2018 was the "first use" of the mark in commerce. Wildcat's invention of the Sandcat mark in December 2017, standing alone, was not sufficient to establish Wildcat as the senior user of the mark.[63] Wildcat's actions in placing a Sandcat sticker that it purchased on the DEL unit used during the April 2018 XTO job similarly does not support Wildcat's ownership of the mark. Rather, the record reflects that, prior to the April 2018 XTO job, DEL and Romac planned to market DEL's modified Total Clean flowback system under the Sandcat mark. Specifically, in March 2018—a month prior to Wildcat's claimed "first use" of the Sandcat mark in commerce—Romac circulated a proposed marketing brochure titled "Romac Environment Services, LLC Presents…the Sandcat Flowback Tank System…."[64] The record also reflects that, at the time of the XTO job, Romac intended to purchase additional Sandcat units from DEL and to market these Sandcat units not only to Wildcat but to other oil and gas services companies.[65] Romac ultimately purchased approximately thirty-five Sandcat units from DEL. Romac rented three units to Wildcat, and made the remaining units available to other services companies. Again, the units were marketed by Romac under the "Sandcat" trademark pursuant to a licensing agreement with DEL. First use of a mark requires use "in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark."[66] Here, the use of the

---

[63] *Blue Bell, Inc.*, 508 F.2d at 1264-65.
[64] Romac Exh. 4; Romac Exh. 2 (March 20, 2018 e-mail from Keith Wingate—Romac—attaching the "Romac Presents…" brochure).
[65] Tr. at 96 (testimony of Jeffrey Weber, owner of Wildcat):
    Q: So as early as April 20 of 2018, you knew that Romac was going to be presenting the Sandcat on its own to customers other than Wildcat, right?
    A: Yes, sir.
[66] *Dep't of Parks & Recreation for State of California v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1126 (9th Cir. 2006) (quoting *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1052 (9th Cir.1999)) (emphasis added). Further, as explained further below, Wildcat's actions in affixing a Sandcat sticker to Romac's unit in April 2018 cannot be deemed a use in connection with the sale of a *service*.

Sandcat mark was not unique or exclusive to Wildcat in a way that would associate *DEL's* product—the modified Total Clean flowback unit marketed as the Sandcat—with Wildcat in the public mind.

Moreover, apart from the question of first use, the evidence does not show that Wildcat's actions in merely affixing a Sandcat label to DEL's unit during the XTO job was a use *in commerce*. "[T]he first to use a designation as a mark *in the sale of goods or services* is the 'owner' and the 'senior user'" of a mark.[67] Wildcat's performance of the XTO job in April 2018 did not involve a sale or shipment of goods.[68] Wildcat never owned a DEL Sandcat unit. Instead, Wildcat leased a Sandcat unit purchased by Romac from DEL, and then used that equipment to perform services for XTO in April 2018. But Wildcat had no part in the manufacture, sale, distribution, or shipment of DEL's Sandcat unit in commerce. Wildcat did not sell DEL Sandcat units to its customers. As with XTO, Wildcat used leased or rented Sandcat units from Romac and DEL to perform services for its customers.[69]

The XTO job was the first commercial use of the Sandcat unit. Considering the record as a whole, however, Wildcat's actions in merely affixing a Sandcat label to the DEL-manufactured flowback unit that Wildcat rented from Romac for the XTO job in April 2018 was neither a "first use" of the mark, nor was it a use of the Sandcat mark in commerce.

### 2. Can Wildcat Overcome the Presumption That DEL Owns the Sandcat Mark?

Wildcat's claim that it is the senior user of the Sandcat mark must further overcome the presumption that DEL owns the mark because DEL is the *manufacturer* of the modified Total

---

[67] Thomas McCarthy, *2 McCarthy on Trademarks and Unfair Competition*, §16:4 at 16-5 (emphasis added).
[68] Wildcat did use the Sandcat mark with respect to a different machine that it designed and manufactured in 2020. But that later use could not have been a *first* use in commerce given Romac's efforts to broadly market the DEL Sandcat unit in 2018 and 2019.
[69] Wildcat entered into a lease agreement with Romac and ultimately leased three Sandcat units from Romac. Romac Exh. 12. (Romac-Wildcat Lease Agreement). That lease agreement expressively refers to leasing "Sandcat" units and quotes a daily rental price for the units. *Id.*

Clean flowback system marketed as the Sandcat. Often trademark disputes arise between the manufacturer of a product and the manufacturer's distributors or dealers. As between the manufacturer and a distributor or dealer, there is a presumption that the manufacturer of goods is the owner of the trademark associated with those goods in the absence of an agreement to the contrary.[70] This presumption is rebuttable based on the consideration of six, so-called "McCarthy factors." Specifically, the court must weigh: (1) which party invented or created the mark; (2) which party first affixed the mark to goods sold; (3) which party's name appeared on packaging and promotional materials in conjunction with the mark; (4) which party exercised control over the nature and quality of goods on which the mark appeared; (5) to which party did customers look as standing behind the goods, e.g., which party received complaints for defects and made appropriate replacement or refund; and (6) which party paid for advertising and promotion of the trademarked product.[71] "The presumption and rebuttal factors of the McCarthy Test place a thumb on the ownership scale in favor of the manufacturer, but invite courts to consider various indicia of ownership designed to elicit the roles and responsibilities of the parties and the expectations of consumers in order to gauge whether, in a given case, the distributor and not the manufacturer operated as the rightful owner of the contested mark."[72]

Here, DEL designed and manufactured the modified Total Clean flowback system that it marketed as the Sandcat. DEL is thus presumed to own the Sandcat trademark for this equipment versus any competing claims by a dealer or distributor. Based on the record, Wildcat has not

---

[70] *See* 2 *McCarthy on Trademarks*, § 16:48 (5th ed); *see also Covertech Fabricating, Inc. v. TVM Bldg. Products, Inc.* 855 F.3d 163, 171 (3d Cir. 2017) (in the absence of an agreement defining ownership of the mark, there is a rebuttable presumption that the manufacturer is the owner of the mark); *Tactica Intern., Inc. v. Atlantic Horizon Intern., Inc.* 154 F. Supp. 2d 586, 600 (S.D.N.Y. 2001) ("As a general rule, where a manufacturer and exclusive distributor contest the ownership of a trademark and no agreement controls, it is the manufacturer who presumptively owns the mark.").
[71] 2 *McCarthy on Trademarks*, § 16:48 (5th Ed).
[72] *Covertech*, 855 F.3d at 171 (citing 2 *McCarthy on Trademarks*, § 16.48 (4th ed. 2017)).

overcome that presumption. First, it is unclear that Wildcat's status even allows it to rebut the presumption in favor of DEL. Wildcat was not a dealer, distributor, or broker with respect DEL's Sandcat units. Rather, Wildcat merely leased or rented the Sandcat units from DEL and Romac and used those units to perform services for its customers. Unlike DEL or Romac, Wildcat did not sell or lease the units. Nor did Wildcat—unlike Romac—enter into a licensing agreement with DEL with respect the Sandcat units. The only contracts signed between Wildcat and DEL or Romac are *lease* agreements. Further, Wildcat entered into no agreements with DEL or Romac addressing Wildcat's use or ownership of the Sandcat mark. A presumption of ownership in favor of the manufacturer is rebuttable in the case of a distributor or dealer because, in some cases, a dealer or distributor may sell products under their own trademark:

> When a dealer buys goods from a manufacturer and applies or has someone else apply the dealer's own "merchant's mark" to the goods, the dealer, not the manufacturer, is the owner of such a trademark.[73]

This is not the case with Wildcat, which does not sell or otherwise lease DEL's products under Wildcat's own tradename. Rather, the record reflects that DEL, Romac, and Wildcat all used the Sandcat name in connection with DEL's modified Total Clean flowback system and that the use of this mark was never exclusive or unique to Wildcat. Accordingly, Wildcat is not in a position to rebut the presumption that DEL owns the Sandcat mark.

Even if Wildcat was in a position to rebut the presumption in favor of DEL, the McCarthy factors do not weigh in Wildcat's favor. Of the six McCarthy factors, the record contains evidence that would support only the first factor—that Wildcat first conceived or "invented" the Sandcat

---

[73] *2 McCarthy on Trademarks*, §16.48 at 113. During closing argument, counsel for DEL referred to "white labeled" merchandise where the marks of different distributors are applied to generic merchandise. Tr. at 333 ("The McCarthy test is designed for situations where you have a manufacturer and a dealer, and it's really designed in situations where you have a company that might be selling a product that's getting white-labeled [i.e. the merchandise is branded with the mark of the dealer/distributor] ....")

mark. Both Mr. Weber and Mr. Brown testified that they conceived the name on a road trip in December 2017. The record does not show any use of the mark "Sandcat" prior to December 2017. Further, Wildcat presented evidence in the form of an email in which Mr. Weber ordered stickers with the Sandcat logo to be placed on DEL's equipment.[74] The remaining factors, however, weigh in favor of DEL's presumption.

With respect to the second factor, there is conflicting evidence as to which party first affixed the Sandcat mark to the equipment. As noted above, Wildcat presented evidence that Weber ordered the stickers that were placed on the Sandcat unit at XTO's work site. However, in his deposition testimony, Keith Wingate testified that he, on behalf of Romac, ordered the stickers for the XTO job and that when he arrived at the job site, stickers with the logo were already on the machine.[75] Moreover, as previously noted, Romac used the Wildcat mark in a marketing brochure prior to the April 2018 XTO job. Considering the record as a whole, this factor does not support Wildcat's claim to the mark.

Nor does the third McCarthy factor weigh in favor of Wildcat because the names of both Romac and Wildcat were placed on the Sandcat unit used on the XTO job.[76]

The fourth factor clearly weighs in favor of DEL. There was no dispute in the evidence presented to the Court that DEL and Mr. Kulbeth exercised control over the nature and quality of the Sandcat units manufactured by DEL.

The fifth factor similarly does not support Wildcat's claim to the mark. With respect to the few Sandcat units leased to Wildcat, the evidence shows that Wildcat's customers would ultimately look to DEL to remedy issues with the Sandcat units. More importantly, with respect to

---

[74] Wildcat Exh. 7.
[75] *See* Deposition of Keith Wingate, Exh. 113, page 60, lines 7-19.
[76] *See* Wildcat Exh. 8.

the remaining units owned by Romac and leased to other service companies, there is no evidence in the record that these service companies would look to Wildcat to address issues with the Sandcat units leased to them by Romac.

As to the sixth and final factor—which party paid for advertising—the Court finds that while Wildcat may have created and printed marketing brochures, Romac and DEL financed most of the advertising and marketing costs for the Sandcat units.

In sum, the record does not overcome the presumption that DEL, as the manufacturer of the modified Total Clean flowback system marketed as the Sandcat, is the owner of the Sandcat mark.

### 3. Does Wildcat Have a Protectable Interest in the Sandcat Mark as a *Service* Mark?

Finally, Wildcat's arguments suggest that it may have ownership of the Sandcat mark as a *service* mark as opposed to a trademark describing the actual Sandcat unit designed and manufactured by DEL. Specifically, at several points, Wildcat refers to the Sandcat mark to describe the services performed by Wildcat on-site for its customers.[77] To the extent that Wildcat is basing its infringement claim on the use of "Sandcat" as a service mark, the record does not support Wildcat's position. The marketing brochures for both Romac and Wildcat refer to "the Sandcat" as the actual modified Total Clean system designed, manufactured, and marketed by DEL.[78] The parties, including Wildcat, also repeatedly referred to this equipment as the Sandcat.[79] A proposed licensing agreement between DEL and Wildcat in June 2018 also revealed that DEL had filed for patent protection for the Sandcat unit.[80] Even if the term "Sandcat" could be construed

---

[77] Tr. at 311 (Wildcat's closing argument stating "we established that Wildcat was the first bona fide user of the trademark Sandcat *and service mark* Sandcat") (emphasis added).
[78] *See* Figure 1 *supra*.
[79] 14, 54, 66, 277.
[80] Tr. at 66.

to describe services performed with DEL's modified Total Clean flowback system, Wildcat knew at the time of the April 2018 XTO job that Romac was marketing DEL's Sandcat unit to other service companies as the Sandcat.[81] Thus, the use of the Sandcat mark was not unique or exclusive to any service provided by Wildcat as opposed to any other service company that leased Romac's other Sandcat units.

* * *

In sum, Wildcat has not proven by a preponderance of the evidence that it appropriated and first used the Sandcat mark merely by affixing a Sandcat label to DEL's equipment during the April 2018 XTO job. Because Wildcat cannot show that it is the senior user of the Sandcat mark, the Court need not address Wildcat's argument that DEL's and Romac's use of the mark created a likelihood of confusion.

### B. Irreparable Harm and The Remaining Requirements for Injunctive Relief.

DEL and Romac further challenge whether Wildcat has satisfied the remaining requirements for injunctive relief, including a showing irreparable harm and that the balance of harm weighs in favor of issuing injunctive relief. Because Wildcat has not established a likelihood of success on the merits, the Court need not address the remaining requirements for injunctive relief.

## IV.
## CONCLUSION

For the foregoing reasons, Wildcat has not satisfied the requirements for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure because the record does not show by preponderance of the evidence that Wildcat is likely to succeed on the merits of a trademark

---

[81] Tr. at 74-76, 88 ("Q: and you knew that Romac was going to be marketing these [Sandcat units] to other parties out in West Texas in the oilfield besides Wildcat, right? A: yes, sir.")

infringement claim based on the Sandcat mark. Accordingly, Wildcat's Motion for Preliminary Injunction [ECF No. 35] is DENIED.

THUS DONE in Chambers on this 10th day of February, 2022.

ROBERT R. SUMMERHAYS
UNITED STATES DISTRICT JUDGE