UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| **ROMAC ENVIRONMENTAL SERVICES LLC ET AL** | **CASE NO.  6:20-CV-00581 LEAD** |
| **VERSUS** | **JUDGE ROBERT R. SUMMERHAYS** |
| **WILDCAT FLUIDS LLC** | **MAGISTRATE JUDGE CAROL B. WHITEHURST** |

**MEMORANDUM RULING**

The present matter before the Court is a *Daubert* Motion and Motion in Limine [ECF No. 161] filed by defendants DEL Corporation and Romac Environmental Services, LLC. Plaintiff WildCat Fluids, LLC has opposed the motion. As explained below, the motion is GRANTED.

**I.**
**BACKGROUND**

The present case involves disputes between plaintiff WildCat Fluids LLC ("WildCat") and defendants Romac Environmental Services LLC and DEL Corporation over the development, ownership, and marketing of a line of oil-field services equipment manufactured by DEL—the "Sandcat." In the early 2000's, DEL developed and patented its Total Clean System to separate solids and liquids.[1] In August 2017, representatives of WildCat and DEL began discussing the design and manufacture by DEL of a trailer-mounted mixing plant to process flowback fluids from "fracking" operations.[2] DEL's President, Robert Kulbeth, testified that he and another DEL representative, Michael Kulbeth, noticed a centrifuge sitting on a rack on WildCat's property and inquired about how that centrifuge was used in WildCat's business operations.[3] The WildCat

---

[1] Transcript of Preliminary Injunction Hearing held September 27-28, 2021 ("Tr.") at 132.
[2] Tr. at 145-47.
[3] *Id.*

1

representatives explained the conventional processes used by service providers to separate gases, liquids, and solids returning from the wellbore during flowback operations, and they explained that they used the centrifuge to remove additional solids to avoid clogging the sock filters that were utilized with the conventional process.[4] Kulbeth testified that, at the time, he recognized that DEL's patented Total Clean System could improve the conventional processes used by oilfield service providers for flowback operations.[5] Kulbeth testified that, with input from WildCat on the needs of its customers, he designed modifications to DEL's original patented system to allow it to separate the three phases of matter (solids, liquids, and gases) returning to the surface during flowback operations.[6] In December 2017, DEL filed for patent protection for the equipment known as "Flowback Separation System and Method," and in February 2020, DEL was granted U.S. Patent No. 10,751,654 for the equipment.[7]

WildCat's plan was that DEL would manufacture the modified Total Clean Flowback System and then either sell or lease the units to WildCat; WildCat would then use the equipment to provide services to its customers. WildCat did not have the financial ability to purchase the equipment.[8] Accordingly, DEL introduced WildCat to Romac.[9] From November 2017 through June 2018, Romac negotiated a potential business arrangement whereby: (i) Romac would invest directly into WildCat so that WildCat could buy the DEL-manufactured Sandcat Units; or (ii) Romac would purchase the DEL-manufactured Sandcat units itself and then lease or rent-to-own at least a portion of the Sandcat fleet to WildCat to assist in the purchase of the equipment.[10] In

---

[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] Tr. at 48, 149-50; DEL Edh. 39.
[8] Tr. at 70, 85.
[9] Tr. at 157-58.
[10] *Id.*

the end, because of WildCat's financial condition, the parties were only able to negotiate a master lease agreement.

In June of 2018, WildCat attempted to negotiate an exclusive license with DEL for the Sandcat unit. On June 13, 2018, Bob Kulbeth, the owner and president of DEL, forwarded a proposed License and Supply Agreement[11] to Weber. This proposal included requirements that WildCat purchase at least ten Sandcat units during the first two years of the agreement, and five units during the next three years. The proposed agreement also required financial guarantees from WildCat.[12] DEL's proposed licensing agreement expressly referred to the equipment as the "Sandcat," and included provisions stating that DEL would own all intellectual property rights related to the Sandcat.[13] WildCat did not have the funds or financial backing to enter into DEL's proposed licensing agreement. Accordingly, on July 25, 2018, DEL entered into an exclusive License and Supply Agreement[14] with Romac, granting it the exclusive right to buy, lease, and market the Sandcat. The License and Supply Agreement referred to the equipment as the Sandcat and provided that DEL would own all intellectual property rights related to the Sandcat.[15] DEL also "retained rights under U.S. Prov. Application No. 62/608,820 to sell and rent Sandcats to customers that will utilize the product within the Field of Use, subject to Sections 4.6, 4.7, and 4.8 of the Agreement," as well as the right to sell or rent "Sandcats to customers that will utilize such products for purposes other than the Field of Use."[16] The agreement also provided that "Romac and DEL shall establish rental rates and sales prices for Sandcats marketed to customers that may utilize such products for purposes of the Field of Use."[17]

---

[11] DEL Exhibit ("Exh.") 49.
[12] DEL Exh. 49.
[13] *Id*.
[14] DEL Exh. 52.
[15] *Id*.
[16] ECF No. 162-2 at ¶¶ 4-5 (citing License and Supply Agreement [ECF No. 162-5] at § 2.1).
[17] ECF No. 162-5 at § 4.9.

In early 2018, WildCat entered into Master Lease Agreements with Romac and DEL covering, *inter alia*, the lease of DEL-manufactured Sandcat units in accordance with established stipulated rates.[18] In May of 2018, WildCat began leasing equipment and requesting services from Romac, and Romac began invoicing WildCat on a monthly basis for rental equipment and services that Romac provided.[19] From May of 2018 through December of 2019, WildCat ordered, accepted, used, and was invoiced for the equipment and services Romac provided.[20]

In 2020, WildCat ceased making payments due under the Master Lease Agreements to both DEL and Romac. When Romac demanded payment, the present lawsuits ensued. WildCat brought claims under state law and a federal trademark infringement claim under the Lanham Act. WildCat then moved for a preliminary injunction enjoining DEL and Romac from using the Sandcat mark, and a hearing on the matter was held on September 27-28, 2021. Following the hearing but before a ruling, WildCat filed its Second Amended Complaint and added claims under the Sherman Antitrust Act, the Louisiana Unfair Trade Practices Act ("LUTPA"), and requests for declaratory relief with respect to patent inventorship, ownership, validity, and enforceability.[21] The requests for declaratory relief pertain to DEL's Sandcat patent. The Court ultimately denied WildCat's request for a preliminary injunction, concluding, *inter alia*, that WildCat failed to demonstrate a likelihood of success on the merits of its Lanham Act claim.[22] The Court then granted summary judgment dismissing WildCat's Sherman Act and LUTPA claims, and granting summary judgment in favor of Romac on its open account claim. DEL subsequently entered into an

---

[18] McElligott Affidavit, at ¶ 5.
[19] McElligott Affidavit, at ¶ 6-7.
[20] McElligott Affidavit, at ¶ 13; *see also*, ECF No. 131, Exhibit D, WildCat's Responses to Romac's First Discovery Requests, at Response to Request for Admission No. 3; *see also* ECF NO. 131, Exhibit E, Transcript of Hearing on Motion for Preliminary Injunction, at Vol. I, pp. 93:09-15.
[21] ECF No. 121.
[22] ECF No. 167.

agreement with WildCat to settle all of WildCat's claims against DEL, including the trademark infringement and patent claims asserted in the case against DEL and Romac.

The present *Daubert* motion pertains to WildCat's designation of Alan Brown as an expert on WildCat's damages—more specifically, WildCat's alleged lost profits. Brown is WildCat's Vice President, and is responsible for "intellectual property, safety, infrastructure, finance, revenue generation, and personnel."[23] Brown is not a retained expert subject to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure but, instead, is subject to the requirements governing non-retained experts under Rule 26(a)(2)(C). According to WildCat, Brown created—and will testify on—three economic and financial models purportedly showing WildCat's lost profits and other damages as a result of DEL's and Romac's conduct:

> 1. Prospective Lost Profits Model - model of WildCat's prospective financial performance from 2019 until 2023, accounting for additional SandCat-derived gross profits based on a graduated delivery schedule1 of SandCat units to WildCat, and accounting for scaled profit margins and expenses based on historical WildCat financial data;
>
> 2. Contract Damages Model - calculation the commissions due from Romac to WildCat based on the Master Lease Agreement between Romac and WildCat, calculated as 25% of the SandCat rental revenues Romac generated by renting the SandCat to third parties other than WildCat; and
>
> 3. Rental Charge Model - calculates the amount WildCat was overcharged for SandCat rentals by DEL and Romac, by comparing the fixed prices actually charged by DEL and Romac to fair market rates charged and/or quoted by DEL and Romac to WildCat at the beginning of the parties' relationship.[24]

Romac challenges Brown's designation as an expert under *Daubert*. It argues that Brown is not qualified to construct and testify on an economic damages model based on his experience and training. It also contends that Brown's damages models are based on faulty data and assumptions, and that they do not reflect actual market conditions or historical data. Romac also faults Brown's

---

[23] ECF No. 161-4 at 6 (Alan Brown CV).
[24] ECF No. 171 at 8.

proposed testimony and models for assuming that WildCat would obtain the financing for the business activity assumed in the models; it argues that this assumption is speculative.

## II.
## DISCUSSION

### A. Admissibility of Brown's Proposed Expert Testimony.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. A witness may be qualified as an expert through knowledge, skill, experience, training, or education.[25] A qualified expert may testify as to his or her opinion if that opinion is based upon sufficient facts and data, is the result of reliable application of reliable principles and methods to the facts of the case, and if the expert's "scientific, technical, or other specialized knowledge" will help the finder of fact understand the evidence or determine a fact at issue.[26] Rule 702 imposes an obligation on a trial court to ensure that expert testimony—whether scientific or not—is not only relevant, but reliable.[27] An expert's opinion may be based on facts or data in the case of which the expert has been made aware or which he or she has personally observed.[28] An expert may not render legal conclusions or provide opinions on legal issues.[29]

Expert testimony is relevant if it is shown "that the expert's reasoning or methodology can be properly applied to the facts in issue."[30] To be reliable, expert testimony must be "grounded in the methods and procedures of science and … be more than unsupported speculation or subjective belief."[31] The proponent of expert testimony has the burden to show by a preponderance of the

---

[25] Fed. R. Evid. 702.
[26] *Id.*
[27] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co., Ltd v. Carmichael*, 526 U.S. 137, 147 (1999).
[28] Fed. R. Evid. 703.
[29] *Renfroe v. Parker*, 974 F.3d 594, 598 (5th Cir. 2020) (citing *Goodman v. Harris Cnty.*, 571 F.3d 388, 399 (5th Cir. 2009)).
[30] *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (citing *Curtis v. M & S Petroleum, Inc*. 174 F.3d 661, 668 (5th Cir.1999)).
[31] *Id.*

evidence it is reliable, not that it is correct.[32] "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, *et al.*"[33] The questions of relevance and reliability are the Court's overarching concern.[34] The analysis should be performed with an eye toward whether the expert opinion will assist the trier of fact, which requires that a proffered expert be able to "bring to the jury more than the lawyers can offer in argument."[35] Whether an expert's opinion would be helpful to the trier of fact is a low bar and turns largely on whether the testimony is relevant; questions related to the bases and sources of an expert's opinion go to the weight of the testimony rather than its admissibility.[36] The Court's role is not to displace the adversary system, but to ensure that the disputed evidence is "sufficiently reliable and relevant to the issue so that it is appropriate for the jury's consideration."[37] Exclusion of expert testimony is the exception rather than the rule—"[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[38]

Here, Romac first challenges Brown's qualifications to offer expert testimony on the damages models disclosed by WildCat. As far as academic training, Brown does not appear to have formal academic training on economic or financial modeling, or on the development of economic damage models. Brown's CV discloses an undergraduate degree in history and "60 plus hours of a graduate-level studies in law, finance, psychology, & theology."[39] However, WildCat

---

[32] *Johnson*, 685 F.3d at 459 (citing *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998)).
[33] *Id.*
[34] *Puga v. RCX Sols., Inc*., 922 F.3d 285, 293–94 (5th Cir. 2019).
[35] *Id.* (internal citations omitted).
[36] *Id.*
[37] *Id.* (citations omitted).
[38] *Id.* (citing *Daubert*, 509 U.S. at 596).
[39] ECF No. 161-4 at 8.

argues that Brown's qualifications as an economic damages expert are based on his business experience which, according to WildCat, includes "experience managing and forecasting finances for business entities, including evaluating and projecting the pro forma financial statements and strategic financial strategies for multiple entities across different industries."[40] Considering Brown's experience and knowledge as reflected in his deposition testimony, WildCat has not met its burden, as the proponent of Brown's proposed expert testimony, to establish that Brown has the necessary qualifications to create and testify on the economic damages models he developed. While the record reflects that Brown has some general finance-related business experience, WildCat has not shown that Brown has the knowledge and experience in the specific types of damage models on which he seeks to testify as an expert. Indeed, in his deposition, Brown testified that he had never performed the type of economic damages analysis on which he seeks to testify in the present case:

> Q    But you've never calculated economic loss damages before this case; have you?
>
> Mr. Joseph:    Objection; form.
>
> A    I have not.
>
> Q    So this is your first foray into the world of being an economic damages calculator; correct?
>
> Mr. Joseph:    Objection; form.
>
> A    That is correct.
>
> Q    And while you say you've done, quote, forecasting for businesses, you've never done it forensically to—for a damage model in a lawsuit; correct?
>
> Mr. Joseph:    Objection; form.
>
> A    That's correct.[41]

---

[40] ECF No. 171 at 10.
[41] ECF No. 161-2 at 24 (Deposition of Allen Brown).

Brown further testified that he did not consult any relevant treatises or other literature in developing his opinions and models:

> Q	Now, what treatises or standards did you review to come up with your economic damage model in this case:
>
> Mr. Joseph:	Objection; form.
>
> A	I did not.
>
> Q	You didn't consult any learned treatises, any accounting principles, any accounting methodologies for computing economic damages in a business case; did you?
>
> A	I did not.
>
> Mr. Joseph:	Objection; form.
>
> Q	In fact, you don't have—other than what's on the internet, you don't have access to any of those treatises or standards; do you?
>
> Mr. Joseph:	Objection; form.
>
> A	I have access to whatever I want to research.
>
> Q	But you didn't do any of that in this case? You didn't do any research on economic damages in this case?
>
> Mr. Joseph:	Objection; form.
>
> A	I did not.[42]

Simply put, Brown is not qualified to opine on the economic damages models proposed by WildCat because (1) he has no formal training in creating economic damage models, (2) he has no business experience in creating economic damage models, and (3) he did not consult any of the relevant literature or other treatises to overcome his lack of experience.

---

[42] *Id*. at 25-26.

The two cases cited by WildCat to support Brown's qualifications—*Rideau v. Lafayette Health Ventures, Inc.* and *Nugent v. Hercules Offshore Corp.*[43]—are distinguishable. In *Rideau,* the court found that the defendants' proposed expert in the field of physician job placement was sufficiently qualified. The court noted that the proposed expert had "twelve years represent[ing] facility searching for qualified physicians, nurse practitioners, and physician assistants."[44] The court also noted that he had experience as a "senior recruiter" and served as a "senior vice president of recruiting," involving physician job placements.[45] The proposed expert in *Rideau* thus had specific job experience in the same subject matter on which he was retained to provide expert testimony. Here, however, Brown expressly testified that he had never performed the economic damage analysis or modeling on which his proposed testimony is based.

In *Nugent*, the proposed expert, Dr. Jacobus was retained to testify on the failure of a safety lanyard that cause the plaintiff to "fall seventy feet into the Gulf of Mexico."[46] The defendant argued that Dr. Jacobus was not qualified to opine on the lanyard failure because he was not "an expert in sewing" and had never been qualified in "as an expert in the manufacture of a safety lanyard." The *Nugent* court summarized the knowledge and experience of the proposed expert:

> [Dr. Jacobus]…has a Batchelor's Degree in Chemistry from Southwestern at Memphis and a Doctorate in Organic Chemistry from the University of Tennessee. He has twenty years of teaching and research experience in chemistry and served as the Chairman of the Tulane University Department of Chemistry from 1979 to 1982. Dr. Jacobus also has twenty-five years of professional experience, including failure analysis and consulting. His primary areas of consultation expertise includes product liability and stress analysis of polymers.[47]

---

[43] No. 6:18-cv-00473, 2019 WL 1923380, at *2 (W.D. La. Apr. 26, 2019); No. 98-cv-3060, 2000 WL 381925, at *4 (E.D. La. Apr. 14, 2000).
[44] 2019 WL 1923380, at *3-4.
[45] *Id.*
[46] *Id.* at *1.
[47] *Nugent*, 2000 WL 381925, at *3-4.

The *Nugent* court rejected the defendant's argument on the grounds that Dr. Jacobus' training and experience were directly related to the matter on which he was retained to testify: "the failure of nylon" that resulted in the failure of the safety lanyard. Here, in contrast, while Brown has generalized experience in financial operations and financial statement, he concedes that he does not have prior experience in the specific subject matter on which he seeks to testify as an expert—economic modeling of loss profits and damages.

In sum, the Court GRANTS the *Daubert* Motion filed by DEL and Romac on the ground that WildCat has not established that Brown is qualified to testify on the subject matter of the economic damages models that WildCat proposes to introduce at trial. Given the Court's ruling the Court need not address Romac's arguments under the "reliability" prong of *Daubert*.

### B. Lay Opinion Testimony on Damages and Lost Profits.

Alternatively, WildCat argues that Brown may offer lay opinion testimony on damages and lost profits given his position as WildCat's Vice President and his knowledge of WildCat's business. Rule 701 of the Federal Rules of Evidence permits a lay witness to give opinion testimony when it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Lay opinion testimony is "rationally based on the witness's perception" if the witness's testimony is based on "first-hand knowledge or observations."[48] In fact, "[t]he modern trend favors the admission of [lay] opinion testimony, provided that it is well founded on personal knowledge and susceptible to specific cross-examination."[49] Under this standard, business owners or officers may testify based

---

[48] *DIJO, Inc.*, 351 F.3d at 685.
[49] *Miss. Chem. Corp.*, 287 F.3d at 374.

11

on personal knowledge obtained from their position and experience.[50] However, they cannot offer lay opinion testimony on matters of which they lack personal knowledge or experience. As one court has observed:

> Rule 701 does not give a corporate owner or officer license to testify about all aspects of the industry or business. An owner or highly placed executive may testify to what his broad responsibility and familiarity with the company or industry has taught him. But if that owner or executive tries to apply general industry or business knowledge to areas or matters about which he or she lacks information or experience that opinion cannot be admitted under Rule 701 because it is not based on personal knowledge and would instead have to be based on specialized knowledge.[51]

Accordingly, courts generally permit company officers to testify as lay witnesses concerning damages issues like lost profits as long as the testimony is within the witness' personal knowledge and competency.[52] But even if a business owner or officer bases a damages or loss calculation on knowledge of that business's own accounts, the data and methodology used must be based on personal knowledge.[53]

Here, Brown is a corporate officer of WildCat and has knowledge of WildCat's business and operations. WildCat contends that Brown can thus offer lay opinion testimony as to WildCat's damages and lost profits. Romac's briefing, however, focuses solely on the admissibility of Brown's testimony as an expert under Rule 702. Romac does not address the admissibility of lay

---

[50] *Versai Mgmt. Corp. v. Clarendon Am. Ins. Co.*, 597 F.3d 729, 737 (5th Cir. 2010) (per curiam).
[51] *Metro Hosp. Partners, Ltd. v. Lexington Ins. Co.*, 84 F.Supp. 3d 553, 563-64 (S.D. Tex 2015).
[52] *See Miss. Chem. Corp.*, 287 F.3d at 373 (collecting cases from other circuits); *Meaux Surface Protection, Inc. v. Fogleman*, 607 F.3d 161, 169 (5th Cir. 2010) (holding in suit involving damages to business that trial court did not abuse its discretion when it permitted plaintiff's chief financial officer to testify concerning lost profits because corporate officer who provides projections or opinions about changes in profits is not an expert but a lay witness); *but see DIJO, Inc. v. Hilton Hotels Corp.*, 351 F.3d 679, 686 (5th Cir. 2003) (vacating damages award where plaintiff's witness had little significant actual knowledge about plaintiff and its operations, so witness could not provide lay opinion testimony).
[53] *See LifeWise Master Funding v. Telebank,* 374 F.3d 917, 930 (10th Cir. 2004) ("Instead of limiting Mr. Livingston's testimony to his experience as a businessperson and president of the company ... LifeWise had him enter into the realm of rolling averages, S-curves, and compound growth rates that appear to be an amalgam of logic, hope, and economic jargon.")

opinion testimony on damages by Brown under Rule 701. In order for Brown's testimony to qualify as admissible testimony, WildCat must show that his testimony satisfies the requirements for lay opinion testimony under Rule 701. Given that Romac's motion does not address the admissibility of lay opinion testimony, the Court will not decide this matter in a vacuum.

### III.
#### CONCLUSION

For the reasons stated above, the Court GRANTS the *Daubert* Motion and Motion in Limine [ECF No. 161] filed by DEL and Romac. The Court's ruling, however, does not preclude WildCat from offering lay opinion testimony to the extent that it can establish the foundation for that testimony under Rule 701.

THUS DONE in Chambers on this 22nd day of September, 2022.

_____
ROBERT R. SUMMERHAYS
UNITED STATES DISTRICT JUDGE